**UNITED STATES of America**

v.

**Michael GRASSO, Jr., et al.**

**Crim. No. 72–181.**

United States District Court,
E. D. Pennsylvania.

April 2, 1973.

See also D.C., 55 F.R.D. 288.

Robert E. J. Curran, U. S. Atty., E. D.Pa., by Malcolm L. Lazin, Asst. U. S. Atty., Philadelphia, Pa., for Government.

F. Emmett Fitzpatrick, Jr., Philadelphia, Pa., for defendants.

## OPINION AND ORDER

HANNUM, District Judge.

Presently before the Court is the motion of the defendant, Jonathan Tori, for judgment of acquittal, or, in the alternative, for a new trial. On March 8,

1972, a federal grand jury rendered a 10 count indictment charging the defendant, along with 3 codefendants, with making or causing to be made various false statements to the Federal Housing Administration in violation of Sections 1010 and 2 of Title 18, U.S.C.[1] The defendant was named in counts 1, 3, 4, 5, 7 and 9. After this Court granted his motion for severance pursuant to Fed.R. Crim.P. 8(b) on May 5, 1972, he was tried before a jury on May 17, 1972. The Government having failed to offer any proof as to the charge made in count 4, and having failed to offer sufficient evidence to prove the charges made in counts 1 and 3, a judgment of acquittal was granted as to each of these counts. Thereafter, on May 25, 1972, the jury found the defendant guilty on counts 5, 7 and 9. It is to these counts that the defendant addresses his present motions.

Tori, along with co-defendant Grasso, were principals in the Grasso-Tori Real Estate Company. Defendants Molinari and Tropea were employees. The counts of which the defendant stands convicted relate to the sale of three separate residential properties located in Philadelphia, and his role in causing the purchasers of each property to conceal the extent of their indebtedness from the Federal Housing Administration. The sale of each property was made possible only by virtue of the FHA's mortgage insurance program. Briefly, this program permits low income individuals to obtain long term mortgages from private lenders and thereby provides the means by which such individuals are capable of financing the purchase of housing. After an agreement of sale is entered into, the prospective purchaser is required to fill out a mortgagee's application for mortgagor approval that is provided by the mortgagee. The application provides information as to the purchaser's financial status and earning history and is used for the purpose of determining whether the applicant is capable of handling the amount of the mortgage requested. Once the form is completed it is given to the prospective mortgagee who is required to check its accuracy by means of an independent credit report. At the same time, or even prior to this point, the prospective mortgagee must apply to the FHA to have the property appraised. An FHA appraiser thereafter determines the maximum mortgage amount that the government will insure. The amount being determined, the mortgage company then fills out another form known as the firm commitment. It contains a statement of the total mortgage to be insured coupled with a breakdown of the proposed monthly mortgage installments. The firm commitment form, the mortgagee's application for mortgagor approval, plus the credit information gathered by the lender are then forwarded to the FHA's mortgage credit section for approval. If the purchaser and the amount of the proposed mortgage are approved, the FHA returns the firm commitment to the mortgagee for its signature and for presentation to the purchaser at settlement. When the settlement takes place, the purchaser sees the firm commitment for the first time. Contained in the firm commitment is a certification which, in addition to the various other

---

[1]. 18 U.S.C. § 1010 provides in pertinent part as follows: "Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Department of Housing and Urban Development for insurance, * * * or for the purpose of influencing in any way the action of such Department, makes, passes, utters, or publishes any statement, knowing the same to be false, * * * shall be fined not more than $5,000 or imprisoned not more than two years, or both."

18 U.S.C. § 2 provides as follows:

"(a) Whoever commits any offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever wilfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

documents placed before him, the purchaser must sign. The certification reads as follows:

"I will not have outstanding any other unpaid obligations contracted in connection with the mortgage transaction or the purchase of the said property except obligations which are secured by property or collateral owned by me independently of the said mortgaged property or obligations approved by the Commissioner [of the FHA]."

Before the FHA finally issues a mortgage insurance certificate, what is referred to as the "closing package" containing the executed firm commitment, the mortgage, the note, and any escrow agreements, is sent to the FHA's closing department for final review and approval. If approved, the FHA mortgage insurance certificate is issued.

Count 5 of the indictment deals with the defendant's involvement in the sale of a residence at 2140 Watkins Street to Ernest and Louise Epperson. At the trial it was established that the Eppersons were shown the residence by Mario Tropea of the Grasso-Tori real estate office. On October 22, 1969, in the presence of both Mario Tropea and Jonathan Tori, the Eppersons executed an agreement of sale. Jonathan Tori's signature appears on the agreement as a witness. On that occasion the Eppersons were told that the home was FHA approved. The sale price was $7500 and the total down payment agreed to was $800. On November 26, 1969, the mortgagee's application for mortgagor approval was submitted to the FHA. On January 10, 1970, the FHA issued the firm commitment. Settlement was held on January 19, 1970 at the 13th and Shunk Street office of the defendant's real estate firm. When Mrs. Epperson arrived she was told that in addition to the $800 down payment that she had already made, she would need another $466 to complete the settlement. Upon her objections and statement that the settlement would have to be called off because she did not have any additional money, Anthony Ciffarelli, the seller, called in

Jonathan Tori to determine whether the settlement could be concluded. Mr. Ciffarelli testified that he spoke to the defendant offering to give up $200 on the sale price if Tori would give up the remaining $266. He then testified that an agreement was reached whereby Mrs. Epperson was to sign a judgment note. Mrs. Ciffarelli testified that the judgment note was for a loan from Tori to the Eppersons in the amount of $466 and that it was agreed to between the Ciffarellies and Tori that when Tori was repaid by Mrs. Epperson, he would send $200 to them. To corroborate this testimony, the Government offered a payment schedule prepared by a secretary of the Grasso-Tori firm and dated January 23, 1970. The total amount of the loan set forth in the schedule was $466.-10. A receipt for $66.10 from Louise Epperson dated the same day and carrying the designation "loan at Set." was also introduced into evidence. Mrs. Epperson testified that the receipt was for the first payment she had made toward repaying the loan.

Count 7 of the indictment deals with the defendant's involvement in the sale of a residence at 2525 South Beulah Street to Louise Holland. At the trial it was established that Mrs. Holland was shown the house by a member of the Grasso-Tori firm and that on December 8, 1969 she entered into an agreement of sale with the owners, Mr. and Mrs. Calabrese. Like the Epperson agreement, this agreement also bore the signature of the defendant. The down payment agreed to was $800. This amount was paid by Mrs. Holland in installments prior to the settlement which took place on March 3, 1970. At an undetermined time prior to settlement Mrs. Holland received one or more telephone calls from the defendant in which she was informed that she would need an additional $800 to complete the settlement. When she told him that she had no additional money available, he told her to come to his office. There he told her that he was going "to help stand [her] for a loan." He thereafter spoke to

someone on the phone telling that person that Mrs. Holland was going to apply for an $800 loan. He then sent Mrs. Holland to the Continental Bank and Trust Company where arrangements for the loan were made. On March 3, 1970, the day of settlement, Mrs. Holland was asked to sign a note to the Continental Bank in the amount of $936 and, in return, was given a check from the bank, dated the same day, in the amount of $805.63. Both Jonathan Tori and Michael Grasso were "in and out." During the settlement, Mrs. Holland was informed that she needed even more money, this time $148. When she explained that she could not possibly provide it, the defendant told her that he would loan her the amount needed. He then presented her with a promissory note in the amount of $148.31 which she signed. Although Mrs. Holland questioned the defendant a day or so after the settlement as to why the additional $148 had been required, she never received an explanation that she could understand.

Count 9 of the indictment deals with the defendant's involvement in the sale of a residence at 2340 Mountain Street to Reginald and Gloria Hayes. At trial it was established that the Hayeses were shown the house by Mario Tropea and that they signed an agreement of sale on May 27, 1970. The down payment agreed to was $700. In early August, Mr. Hayes received a letter from the defendant requesting that the Hayeses come see him at the 18th and Passyunk office of the Grasso-Tori firm. There, the Hayeses met the defendant who explained to them that they would need an additional $900 to complete the settlement. After the Hayeses explained that they could not afford the additional amount, Tori said, "Well, I could get you the money through the bank or through other sources." The Hayeses said they would prefer a bank loan whereupon Tori sent them to Rocco Molinari, also of the firm, who, in turn, sent them to Continental Bank and Trust Company. Although the loan was approved in advance of the settlement Mr. Hayes was told that he could not pick up the money prior to that date. On September 18, 1970, the date of settlement, Mr. Hayes was required to go to Tori's office where he obtained a letter authorizing the bank to give him a check in the amount of the approved loan. Mr. Hayes went to the bank, cashed the check that was waiting, and returned to the settlement with the proceeds, $990.-94. The defendant was present during the settlement.

Like the Epperson mortgage, both the Hayes and Holland mortgages were insured through the FHA. In each sale the purchasers signed, among the other documents presented, the FHA firm commitment which included the certification that they had not incurred any additional undisclosed financial obligations contracted in connection with the mortgage transaction or the purchase of the property. Although they were not specifically asked, it became apparent that each of the purchasers had, at best, a minimal understanding of the nature of the FHA documents they were signing. The defendant, on the other hand, having been a licensed real estate broker since 1964, had been familiar with FHA transactions since that time. When taking the stand in his defense, he testified that he was aware of the various provisions contained in the firm commitment and, specifically that he was aware of the mortgagor's certificate that was required to be signed.

■ Of the arguments advanced by the defendant in support of his motions, the first to be considered is his argument that the Government failed to prove that Mrs. Epperson (Count 5) ever made a false statement to the FHA. The defendant argues that he could not, therefore, be a principal to an act that was not criminal. His theory is that Mrs. Epperson signed the mortgagor's certificate before the defendant agreed to lend her any money and therefore that the mortgagor's certificate at the moment it was signed, was true.

Though seemingly ingenious, the defendant's argument assumes that the conduct prohibited by 18 U.S.C. § 1010 is limited to the "making" of a false statement. The statute, however, also proscribes the "passing, uttering, or publishing" of a false statement. The mortgagor's certificate was in the control of Mrs. Epperson until the settlement was concluded. The settlement was not concluded until she agreed to the loan offered by the defendant and had signed the judgment note that he had presented to her. At that point the mortgagor's certificate was false and was "passed, uttered, or published" to the FHA.

Next, the defendant argues that the Government failed to prove that any of the purchasers acted with the *mens rea* required to constitute a violation of section 1010. Failing to prove that any of them acted with a criminal state of mind, the defendant argues that the Government has failed to prove that any crime was committed in which the defendant could be said to have participated as an "aider and abettor." Again, though seemingly logical, the defendant's argument is not consistent with the law.

■ The defendant's conviction rests upon 18 U.S.C. § 2 which describes those individuals who are punishable as principals in offenses against the United States. Section 2 has two subsections. Although the conduct described in § 2(a) is apparently broad enough to overlap that described in § 2(b), it is clear that section 2, taken as a whole, proscribes two distinct forms of conduct: (1) participation in a criminal plan involving others who act with a criminal state of mind, and (2) the commission of a crime by the use of an innocent or irresponsible agent. To be convicted as a principal under the first subsection would clearly require proof of criminal conduct on behalf of more than one person. A conviction under the second subsection, however, requires proof of criminal conduct on behalf of only one person.

■ Assuming, as the defendant seems to, that section 2(b) does not exist and that the Government was limited in its case to proving only aiding and abetting under section 2(a), the defendant is still incorrect in his assertion that the Government must prove that those who performed the actual illegal acts acted with a criminal state of mind. On the contrary, although the law is clear that the Government must establish that the crime in question was committed by someone, United States v. Provenzano, 334 F.2d 678, 691 (3rd Cir. 1964), it is also clear that the Government need only prove that "*the act* constituting the offense was in fact committed by someone." Gray v. United States, 104 U.S. App.D.C. 153, 260 F.2d 483, 484 (1958); Meredith v. United States, 238 F.2d 535, 542 (4th Cir. 1956); Colosacco v. United States, 196 F.2d 165, 167 (10th Cir. 1952); Von Patzoll v. United States, 163 F.2d 216, 219 (10th Cir. 1947). Thus, regardless of whether the Government pursues a 2(a) or 2(b) theory at trial, its minimum burden of proof with respect to state of mind is, in either case, limited to that of the defendant. In any event, the prosecution in the present case proceeded on the theory that the defendant was guilty as a principal under section 2(b). In this regard there remains a related question.

■ When testifying, the defendant admitted that during the period involved in the indictment he knew that to arrange loans for FHA insured purchasers was illegal. As stated previously, he also testified that he was aware of the mortgagor's certificate contained in the firm commitment. From his admitted familiarity with the FHA's mortgage insurance program, it is clear that he was also aware that any settlement would be placed in serious jeopardy should a prospective purchaser fail to sign the mortgagor's certificate without qualification. The thrust of his defense was that he never arranged any loans for any of the purchasers named in the indictment. By its verdict, however, the jury found that he did.

**820**

Given the foregoing, coupled with the fact that the defendant was present at one point or another during each settlement, the question remaining is whether the defendant could be found to have "caused" acts to be done which, if directly performed by him or another, would constitute an offense against the United States.

The defendant argues that the only criminal act that took place was one of omission, i. e., that the respective purchasers failed to disclose additional obligations incurred in connection with the purchase of their properties. Since the government made no attempt to prove that the defendant ever suggested to any purchaser that they should purposely conceal their indebtedness, he argues that he cannot be said to have "caused" them to make false statements. Again, however, the defendant ignores the plain language of the statute. The false statements in the present case were made by the affirmative acts of the purchasers when they signed their mortgagor certificates. In United States v. Inciso, 292 F.2d 374, 378 (7th Cir. 1961), it was said that one who "procures" or "brings about" the commission of a crime is chargeable as a principal under section 2(b). Similarly, in United States v. Legett, 269 F.2d 35, 37 (7th Cir. 1959), it was held that,

> "Cause means 'to bring about; to bring into existence' . . . It 'is a word of very broad import' and 'is used in [18 U.S.C.A. § 2(b)] in its well known sense of bringing about'."

See also, United States v. Markee, 425 F.2d 1043, 1046 (9th Cir. 1970); United States v. Miller, 379 F.2d 483, 485 (7th Cir. 1967).

But for the loans arranged by the defendant, no settlements would have taken place and no false statements would have been made. Even applying a narrow reading of section 2(b) to these circumstances, there can be little doubt that the defendant caused each of the purchasers to make the false statements charged in the indictment.

For this reason, and those previously discussed, the defendant's motion for judgment of acquittal and/or a new trial will be denied.