**UNITED STATES**

v.

**Theodore CLEARFIELD.**

**Crim. No. 72–294.**

United States District Court,
E. D. Pennsylvania.

April 25, 1973.

Robert E. J. Curran, U. S. Atty., Malcolm L. Lazin, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Mitchell S. Lipschutz, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

We have before us the motions of defendant Theodore Clearfield for a new trial and arrest of judgment in the wake of a four-week-long non-jury trial [1] in which he was charged with sixteen counts of violating or aiding and abetting violations of 18 U.S.C. § 1001.[2]

---

1. 65 witnesses testified at the trial.

2. 18 U.S.C. § 1001 provides:
   Whoever, in any matter within the jurisdiction of any department or agen-

Defendant is a licensed real estate broker who sold a considerable number of inner city houses, which he owned, with the aid of FHA-insured mortgages which he obtained for the purchasers. The gravamen of the government's case was that the FHA mortgage insurance was obtained as the result of certifications submitted to the FHA by defendant which falsely represented the condition of the properties in question. In a general verdict at the conclusion of the trial[3], we acquitted defendant on nine counts but adjudged him guilty on seven counts of the indictment.[4]

The motions raise three principal claims: *first*, that there was insufficient evidence that defendant knew that the certifications were false to permit a finding of knowing and willful conduct by defendant to sustain the verdict (18 U.S.C. §§ 2 and 1001 proscribe only willful conduct); *second*, that the indictment was faulty in that it charged defendant under a statute of general application (18 U.S.C. § 1001), whereas a statute of specific application carrying a lesser penalty was available (18 U.S.C. § 1010, which proscribes the making of false statements for the purpose of influencing the action of the Department of Housing and Urban Development; and third, that it was error to convict defendant of aiding and abetting his co-defendants when the government did not succeed in convicting any of them as a principal.

Neither the government nor the defendant has ordered the notes of testimony; however, we took detailed notes at the trial and our recollection of the testimony is clear. We conclude that there was indeed sufficient evidence of willfulness to sustain the verdict. Because we also find the remaining claims to be lacking in merit, defendant's motions will be denied.[5]

---

cy of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

3. Defendant at no time requested findings under F.R.Crim.P. 23(c).

4. Defendant was convicted on counts 3, 4, 5, 7, 8, 14, and 16 and was acquitted on counts 1, 2, 6, 9, 10, 11, 12, 13 and 15.

5. Defendant has argued several other points. *First*, he asserts that we erred in denying him access to the notes of testimony of persons who appeared against him before the grand jury. However, none of the witnesses who testified against defendant also testified before the grand jury, with the exception of Marvin Bank, the Assistant Vice President of United Brokers Mortgage Co. Bank's testimony related to the general procedures followed in procuring FHA mortgages and to certain business records; none of the areas covered in Bank's testimony was in dispute. Moreover, the court reporter has read to us the notes of Bank's testimony, which confirm our recollection that defendant did not at that time demand the grand jury notes. We have reviewed the authority cited in defendant's brief in this area, but on the basis of the facts of this case pertaining to grand jury notes, we find defendant's contention to be lacking in merit. *Second*, defendant complains that in sustaining a Fifth Amendment privilege claim by two codefendants, Bruce Hammer, an electrician, and Edward Goodman, a plumber, who had been acquitted at the conclusion of the government's case, we deprived him of his right to compulsory process. We held a voir dire on the matter at the time and heard argument, and were satisfied that, because Hammer and Goodman had submitted certifications (possibly false) as to the condition of many properties in addition to those which were the subject of the indictment, their testimony might well have placed them in jeopardy not only with respect to federal charges arising out of such other certifications (the United States Attorney represented that the grand jury investigation into the general area was still ongoing) but also with respect to state fraud charges. Indeed, at a hearing held in the midst of the trial on the motion of Goodman to suppress certain statements that he had made, it appeared not only that Goodman had given a number of certifications, which the government believed to be false, to

## II. *Sufficiency of Evidence of Knowledge and Willfulness*

Generally, in evaluating the sufficiency of evidence to sustain a conviction, the Court must view all the facts and the inferences reasonably to be drawn therefrom in the light most favorable to the government, United States v. Dukow, 465 F.2d 688 (3d Cir. 1972). That standard seems somewhat inappropriate in reviewing a nonjury case where the judge is able to articulate his findings. In the summary that follows, the facts which we recite are those which, as the finder of fact, we found. As will be seen, by any standard they sustain the conviction.

Defendant acquired title to the dwellings in question in the names of himself and his wife. Looking toward the sale of the properties through the vehicle of FHA-insured mortgages, he arranged, through several mortgage brokerage companies with which he had a course of dealing, for the properties to be inspected and appraised by FHA.[6] Under the FHA procedure, the inspection identified those defects in the property which must be remedied so that the property will comply with FHA standards. At the time in question the FHA determination as to compliance was a non-objective one: there was no requirement that the plumbing, heating, or electrical systems, for instance, comply with any fixed national or local code or standard; rather, the FHA inspector made a subjective determination as to whether the item he was inspecting functioned adequately and whether repairs and improvements were performed in a workmanlike manner.[7] The appraisal, on the

Tower Real Estate, also indicted for FHA fraud, to defendant, and to other realtors, but also that the government had informally agreed to refrain from prosecuting Goodman only if he was "candid" with respect to all certifications submitted by him in all cases, whatever that means. And, we find no authority to support defendant's bald assertion that a more stringent standard must be applied to privilege claims by defense witnesses than to those of government witnesses. *Third,* defendant contends that we erred in denying a "full and complete" bill of particulars prior to trial. In actuality, the government opened virtually its entire file to defendant and the motion for bill of particulars was dismissed, mostly for that reason, as moot. To the extent that defendant's motion requested (as it did) that the government disclose every bit of evidence that it would adduce from the mouths of witnesses at trial, we dismissed it on the merits. As was noted in United States v. Dioguardi, 332 F.Supp. 7, 14 (S.D.N.Y.1971):

The purpose of Rule 7(f) is "to enable the accused to meet the charges presented against him" and accordingly the rule "should be liberally interpreted to carry out this purpose." United States v. O'Connor, 237 F.2d 466, 476 (2d Cir. 1956). Further, as stated in the notes of the Advisory Committee, the 1966 amendments to Rule 7 were intended "to encourage a more liberal attitude by the courts towards bills of particulars without taking away the discretion which courts must have in dealing with such motions in individual cases." See also 8 Moore's Fed.Practice ¶ 7.06 [1] and [2] (1970 Ed). Criteria for the application of Rule 7 in fraud cases have been collated in United States v. Crisona, supra, [D.C.,] 271 F.Supp. [150,] at 155–156. At the outset it should be recalled that the proper office of a bill of particulars is not discovery of the government's evidence or legal theory, but to achieve a meaningful clarification of the indictment.

In this case, the charges against defendant were more than illuminated by the indictment, and the government file was made available to him. We believe that we properly exercised our discretion in denying defendant, by way of a bill of particulars, an exegesis of all the evidence the government planned to adduce at trial.

6. Needless to say, without the FHA insurance, the mortgage companies in question would not have made the otherwise high-risk loans.

7. Anthony Ciao, Deputy Assistant Director for Technical Services of HUD's Philadelphia area office, testified that it would be impossible to bring an older home up to municipal code specifications without rebuilding it. However, in some instances, there were certain "unwritten" FHA standards, such as the number of electrical receptacles required per room.

other hand, fixed the value (anticipating the repairs) of the property for FHA mortgage purposes, thereby determining the amount of the mortgage on the property that FHA would insure.

After review of the inspection and appraisal reports, FHA prepared the document, central to this case, known as the conditional commitment. That document constituted an agreement between FHA and the buyer [8] that FHA would insure the mortgage on the subject property at a given figure so long as those items of work noted on the conditional commitment were properly performed. According to the evidence, under the FHA procedures at the time in question, the requirements of the conditional commitment were to be satisfied by a combination of two methods: (1) submission by a tradesman of a certification that the roof, plumbing and heating, or electrical system was in good order and repair; and (2) an "architectural" reinspection as to other items by an FHA staff employee. The evidence showed that the inspector making the architectural reinspection would generally check only the items of which reinspection was requested and would not look beyond them or make a general reinspection of the house to see if it was in good condition.

Having secured a conditional commitment for a given property, defendant would proceed in two directions. First, he would direct one of several contractors with whom he had a general course of dealing to perform necessary repairs upon the house or to inspect the house and supply him with a certification that a system in question was in good order and repair. Second, he would list the house for sale and find a purchaser. Each prospective purchaser would be shown the house by defendant or one of his salesmen before signing the agreement, and upon signing the agreement the purchaser would be directed to the mortgage broker or company with which defendant was dealing. There the necessary credit information was procured and the mortgage application was completed. Prior to the date scheduled for settlement, defendant would procure from his tradesmen the necessary certifications, sending a copy to the mortgage company and retaining the original for transmission to FHA via the title clerk who presided at the settlement.[9] Where necessary, an architectural reinspection would also be arranged.

As we noted at the outset, the government's case was that defendant submitted (or aided and abetted the submission of) false certifications as to the condition of the properties involved in the various counts of the indictment. In terms of the precise statutory language, each count charged that defendant and the tradesman preparing the certification made a false statement as to material facts in a matter within the jurisdiction of FHA, in that a certification submitted to the FHA stated the condition of a certain portion of the premises whereas the tradesman in fact knew that the premises was not in such condition. Four tradesmen were named as

---

8. In the transactions involved here, the identity of the buyer was not yet known. This, however, did not affect the matter; the inspection and appraisal and commitment procedure continued as though the buyer were known. In due course FHA also issued a "final commitment" for each property.

9. At the time of the transactions here involved, while a certain FHA circular letter required that the mortgage company or purchaser was to obtain the certifications, they did not proscribe, as the source or origin, the seller or selling broker. Defendant knew this.

Had FHA regulations contained such a proscription, the acts forming the basis of the charges and conviction could not have occurred. Indeed, while we sustain the conviction, it is not inappropriate to note that FHA laxity, particularly: (1) lack of objective standards by which to determine habitability of the property; (2) reliance upon tradesmen's certifications as a substitute for thorough reinspection prior to issuance of the final commitment; and (3) failure to insure that certifications did not emanate from the seller, made the offenses committed by defendant possible. Hopefully this situation has now been corrected.

codefendants: Bruce Hammer (Hammer), an electrician, Edward Goodman (Goodman), a plumber, Clayton Kelley (Kelley), a roofer, and one "Ben Johnson," allegedly a plumber. The identity and indeed even the existence of "Ben Johnson" was a major issue at the trial (see *infra*).

We granted a motion for judgment of acquittal as to Hammer and Goodman at the conclusion of the government's case because, *inter alia,* the government produced no evidence showing that they knew that the certifications which they made were destined for FHA.[10] Kelley had entered a guilty plea prior to trial and appeared as a government witness. In the course of his testimony, it appeared that he too was unaware of the destination of the certifications (he had previously worked for defendant in matters involving the Philadelphia Housing Authority (PHA)), and there was evidence that Kelley thought that PHA was involved in the present case. Accordingly, even though we believed that some of Kelley's certifications were false, we permitted him to withdraw his plea and the government ultimately dismissed the indictment as to him. "Johnson" never appeared. The indictment also charged that one Marvin Nussbaum (Nussbaum), a plumber, made false certifications which defendant submitted to FHA. Nussbaum was not named as a defendant, and appeared as a government witness at trial.

The bulk of the government's evidence came from the mouths of homebuyers who, one after another, testified that when they moved into the properties[11] there was an enormous variety of major problems—serious roof leaks, malfunctioning heating systems, defective wiring and inadequate outlets, missing

pipes and pipes with holes, rotten sewer lines, clogged and cracked drains, stopped-up toilets, leaking bathtubs, sinks and toilets, improperly connected plumbing lines, weak water pressure, disconnected rain conductors, and so forth. Although defendant, who took the witness stand, minimized the purchaser's complaints, he did not for the most part deny them and instead stressed the efforts that he made to correct the defective conditions.

We turn first to the question whether the government proved that defendant *knew* the certifications were false, for that is the principal area of defendant's concern. We will deal, of course, only with those counts on which we found defendant guilty.[12] Of the seven counts on which we adjudged defendant guilty, three counts involved certifications submitted by Kelley, two involved certifications submitted by Nussbaum, and two involved certifications submitted by "Ben Johnson." We shall take them up in that order.

Defendant sold a house at 5653 McMahon Street to one Juanita Adams. In order to induce FHA to insure the mortgage, he submitted a certification signed by Kelley to the effect that Kelley had placed a new roof on the property and that the roof was in good condition. The defendant told Mrs. Adams that the roof was new; however, at the first rain after she moved in the roof leaked "everywhere." Edward Donnelly, a roofing expert retained by FHA, examined the roof and we credit his testimony that one-third of the main roof had been newly (although poorly) refinished within the last couple of years with rolled roofing, but that the remainder of the roof was in poor condition and had had no new roofing for at least forty years. Kelley testified that he had ap-

---

10. As it turned out, we also acquitted defendant on the counts involving certifications by Hammer and Goodman, since the government's case as to falsity of those certifications was weak or inconclusive.

11. The purchasers were in no case permitted to visit their houses between the signing of the agreement and settlement.

12. We find, based upon the evidence recited in the succeeding portions of the text, that the contractor preparing each certification knew that it was false.

plied a new "hot" roof to the back of the property but that with respect to the front of the property, where the slate roof was in poor condition, he had done nothing. Kelley further testified that he had informed defendant that he did not do slate work and that he had not replaced that portion of the roof, whereupon, according to Kelley, defendant said that he would "take care of it." We credit that testimony and also find that defendant never did "take care of it." Defendant's personal familiarity with the property was demonstrated by the credited testimony of Ellsworth Williams, a contractor employed by defendant (see extended discussion *infra*), that defendant visited the properties (including 5653 McMahon) while the rehabilitation was underway and inspected the work. Having found the foregoing facts, we conclude that when defendant submitted the certification that there was a new roof on the property and that the roof was in good condition, he knowingly submitted a false certification.[13]

Kelley also submitted a certification with respect to the condition of the roof at 1938 E. York Street which had been sold to the McCafferty family. The certification was to the effect that the "roof was in good condition." On the other hand, we find that Kelley had told defendant that the roof was in bad shape and that it needed at least a one-ply roof which would cost from $200 to $300. There was also evidence from which we found that the leaks in the property were visible and that defendant had personally visited the property to make an inspection. Kelley certified the work because of defendant's promise that he would tell him to go ahead with the work when he was "sure the property is mine."[13a] However, defendant never authorized Kelley to do the work, although after the certification had been submitted, the mortgage insured, and title passed to the buyers, defendant paid Mr. McCafferty $175 to cover repairs which Mr. McCafferty thereafter made himself. From the foregoing, we find that when defendant submitted Kelley's certification to FHA, he knew that the roof was in poor condition and he knew that the certification was false.[14]

Kelley also signed a certification with respect to 158 W. Hortter Street. Kelley had inspected the premises and found that the wood shingle roof needed repair (the shingles were broken, the rafters were exposed, etc.). He testified, and we find, that he told defendant that it needed repair and that it was likely to leak if there was a heavy rain, but that he did not do that kind of work. We further find that Kelley certified the roof as being in good condition because defendant said he would take care of it, but that defendant never did so. When the buyers, the Calvin Smiths, moved in, the leaks in the shed kitchen roof and the main roof were severe. Indeed, the effect of the leak on the shed kitchen wall had been seen by defendant's salesman when he was showing the home to the buyers, and the salesman had said that it would be taken care of, but, as noted, it was not. The FHA expert, Donnelly, whom we credit, testified that there had been no reroofing on the main roof for at least ten years, that the shingles on the south side of the roof were worn through, exposing the roof in over a dozen places, that the holes were as large as two inches in diameter and were at least four years old, and that there were multiple leaks at the time of his inspection. Based upon the foregoing, we find that defendant knew that Kelley's certification was false and that he submitted it to FHA notwithstanding.[15]

The Smith house at 158 W. Hortter Street was the subject of a certification signed by Nussbaum that he had in-

---

13. These matters are covered by count 14 of the indictment.

13a. Clearfield had the property under agreement of sale at the time. He formally acquired title to the property and then conveyed title to the McCaffertys at successive settlements on the same day.

14. Count 4.

15. Count 5.

spected the plumbing and heating systems and that they were "in satisfactory working condition at this time with all drains being free of obstruction." In contrast to Nussbaum's certification, Mr. Smith testified that after he moved in, the leak from the second floor bathroom into the living room was so severe that the ceiling was half caved in and the plaster was down (this situation had been covered over by new wallpaper!);[16] the second floor bathroom sink drainpipe leaked; steam was escaping from the radiators. We credit this testimony. In our view, the defects in the plumbing and heating systems found by FHA's expert inspector, Edward R. O'Brien, some two years later were of such magnitude that they must have inhered in the condition of the property at the time of settlement. These defects included low water pressure; a water heater in very poor condition; the main drain discharging through the wall from three different locations; a cracked rear basement drain; badly leaking kitchen faucets; problems in the second floor bathroom, including leaking sink faucets, a bad trap, a leaking tub drain, and a broken toilet; problems in the third floor bathroom, such as leaking tub faucets and defective toilet; and bad pipes around the boiler, leaking basement mains, and indications of leaking air vent valves. Nussbaum never inspected the property because defendant gave him the wrong key and he could not gain entrance. He signed the certification because of defendant's assurances that the plumbing and heating systems were in good condition. Defendant was not only the owner of the property, but, as a licensed real estate broker, sold the property after having shown it to the Smiths through his salesman. We thus find on multiple grounds that defendant in fact knew the condition of the property, and that Nussbaum's certification was known by defendant to be false.[17]

Nussbaum also prepared a certification that the plumbing and heating systems were in good order with respect to the McCafferty property at 1938 E. York Street. Nussbaum testified that he told defendant that certain heating ducts in the cellar were defective and needed repair; defendant told him that they would be repaired and requested that he issue the certification anyway, and Nussbaum did so. Although defendant denied this conversation, we credit Nussbaum's testimony. Since, contrary to defendant's representation, the work in question was not performed by the time of settlement, the certification was false and defendant knew that it was false. We note too that the McCaffertys, unlike the other purchasers, had been living in the premises under lease for some time. They also complained that the heater transformer was defective and that there was no heat in the back bedroom or kitchen. Defendant had gone through the property with the McCaffertys. Our finding that defendant knew that the plumbing and heating certification with respect to 1938 E. York Street was false is thus based upon more than sufficient evidence.[18]

We now turn to the defendant's most egregious wrongdoing—the Ben Johnson matter. Defendant sold the property at 1210 W. Allegheny Avenue to Isaac Johnson and his wife. The FHA mortgage insurance was procured with the aid of a certification on the letterhead of "Ben Johnson, Registered Plumbing-Heating, 1230 Melon Street," which read:

I have inspected the plumbing and heating systems at the above referenced property and find that all the equipment is in good operating condition including all the outside drains.
/s/ Ben Johnson

In contrast to the certification, Isaac Johnson testified that when he and his

---

16. There was a pattern of covering up defects in a number of these properties.

17. Count 7.

18. Count 3.

wife moved in, the toilet was backed up, the sewer line was rotted out in the basement, the sink drain leaked into the basement, the basement had become wet and malodorous, and the oil burner produced no heat and soon quit entirely. Mrs. Johnson testified that the pipes were old and that one large rusty pipe had been painted over but burst soon after they moved in. She added that the pipes in the second floor bathroom were rotten and water poured into the dining room, ruining the paper and plaster, and that the kitchen sink pipes were rusted and leaked where they entered the cellar. We credit Mr. and Mrs. Johnson's testimony.[19]

"Ben Johnson" also signed a certification with respect to 5653 McMahon Street:

> I have inspected the above property and found all the plumbing in good working condition including all the outside drains. I inspected the entire heating system and found it to be in good working condition. No repairs are required on the above property.
> /s/ Ben Johnson

Mrs. Adams testified that when she moved in, the furnace threw no heat, all the drains were stopped, the sewer was backed up in the basement, and the soil line was clogged and overflowed in the basement. An expert sent by FHA some two years after settlement testified as to certain structural defects which (we find) must have been present at the time of settlement: the water heater had a non-approved relief valve, the main drain line was open at the test tee, and the kitchen drain line had an improper connection into the soil pipe in that there was an opening in the line where an undersized trap discharged into it. We credit the testimony of Mrs. Adams and the FHA expert.[20] As noted above, defendant owned both 1210 W. Allegheny Avenue and 5653 McMahon Street prior to their sale, sold them to the purchasers with the aid of his salesmen, who showed the prospective purchasers through the property, and visited them during rehabilitation. We thus find that defendant was aware of the condition of the plumbing and heating in both houses. However, that finding is only one ingredient of our finding that defendant knew the certifications were false, for we also find that Ben Johnson was not an actual person, that defendant knew it, and hence that the certifications which he submitted to FHA on Ben Johnson's letterhead were patently fraudulent.

FHA and the FBI conducted an exhaustive investigation in an unsuccessful attempt to locate "Ben Johnson." No record could be found of him in the neighborhood (1230 Melon Street had been torn down before the date on the certifications), nor could he be located through Philadelphia's registry of licensed plumbers, or through telephone listings or motor vehicle registrations or any other conventional source of information. However, it was not until the waning phase of the trial that the Ben Johnson matter came into sharp focus. At that juncture defendant produced Ellsworth Williams (Williams), a contractor, to testify that, at defendant's behest, he and his workmen had performed labor in a workmanlike manner on a number of the properties in issue, including carpentry, plastering, paperhanging, painting, roofing, and cement work. In response to certain questions on direct examination, Williams intimated that Ben Johnson was a workman with whom Williams had a vague acquaintance.

On cross-examination the Assistant United States Attorney probed sharply into Williams' knowledge of or relationship with Ben Johnson. At first Williams' answers were contradictory. They then became evasive and in due course we appointed counsel for him. After consultation with counsel during a recess, Williams resumed the stand. He testified that in 1969 when he had demanded monies due from the defendant,

---

19. Count 8.

20. Count 16.

who was unable to pay him, the defendant informed him that he was "broke" and needed to go to the bank to get "25 big ones," and needed a certification to give the bank. At that point defendant suggested to Williams, whose son Roy was also present, that he "get billheads printed." Thereupon Roy Williams procured billheads under the name of Ben Johnson. According to Williams, the certifications were signed in blank from time to time by either him or Roy and were completed by defendant. At first Williams had his son (who for this purpose was "Ben Johnson") sign the certifications; later he just signed them himself, "figuring" that the defendant was "an honest man." Defendant told Williams that the certifications were for the inspectors at the bank. Williams testified that he did not own a typewriter and did not know that the certifications were going to FHA. On redirect examination by defendant's counsel, Williams said that he had from time to time procured workmen for defendant; however, Williams steadfastly denied that Ben Johnson was the real or fictitious name of a workman who was procured for defendant by Williams, and he denied defense counsel's suggestion that Ben Johnson was a fraud perpetrated on defendant by Williams in order to get defendant's business. An FBI handwriting expert identified the signature of Ben Johnson on several certifications submitted to FHA as that of Ellsworth Williams.

Defendant took the witness stand and addressed the Ben Johnson matter. He claimed that he received all the Ben Johnson certifications from Williams. According to the defendant, Williams sought defendant's plumbing work and in order to obtain it represented that he had the services of a registered plumber named Ben Johnson. Defendant testified that Williams told him that Ben Johnson had done the work and he (defendant) thereupon accepted Ben Johnson's certifications as those of a registered plumber. Defendant conceded that he had never checked to see if there was a registered plumber by the name of Ben Johnson on Melon Street. He denied that he ever asked Williams to sign "Ben Johnson" to blank forms. Defendant stated that at one point, when he was beginning to doubt whether there was a Ben Johnson, Williams brought his son Roy into the office and introduced him as Ben Johnson. According to defendant, Williams stated that "He's as good as any registered plumber." Defendant also testified that Roy Williams signed the name "Ben Johnson" on certain certifications in his presence, but not by defendant's connivance.

We reject the testimony of defendant and credit the testimony of Ellsworth Williams on the subject of Ben Johnson. We find that defendant knew that the Ben Johnson certifications were false but that defendant nonetheless submitted them to FHA in order to secure mortgage insurance on the properties he was attempting to sell.

In general, defendant's testimony was to the effect that the homes which he had rehabilitated were in good order and repair when sold but that the purchasers were individuals "not ready for home ownership" who had run them down, or that they were vandalized, causing the defects complained of. According to defendant, his contractors were good workmen and he relied on their work and on their certifications. He denied having submitted any false certifications to FHA and maintained that his difficulties were caused by his having been made the scapegoat (in the Philadelphia area) for the failure of the FHA program. Moreover, defendant asserted that even after settlement, he handled all complaints of the purchasers and made repairs when requested even though it was not his responsibility to do so. He also produced numerous character witnesses.

There were nine counts on which we did not feel that the government had sustained its burden of proof. However, on the remaining seven counts, we rejected Clearfield's evidence and credited the government's witnesses. The case

presented a classic factual dispute and we, as trier of facts, resolved those issues in favor of the government.

■■■ The elements of an offense under Section 1001 are: (1) that the defendant made a statement; (2) that the statement was false and the defendant knew it was false; (3) that the statement was made knowingly and willfully; (4) that the statement was within the jurisdiction of a federal agency; (5) that the statement was material.[21] Our review of the record reconfirms our verdict that all of the elements of the offense were proved by the government beyond a reasonable doubt. The only elements seriously in issue were elements (2) and (3). With respect to (1), the defendant transmitted the statements to FHA and in our view was guilty as a principal, although alternatively as an aider and abetter, but this question will be discussed further *infra*. With respect to (4), there is no doubt that the certifications concerned matters within the jurisdiction of a federal agency, the FHA.[22] And we had no difficulty in concluding, with respect to element (5), that the certifications were material.[23]

■■■ In our discussion of the facts, we noted our finding that the certifications in question were false and that defendant had actual knowledge of their falsity. Hence, element (2) is satisfied, although we also note that knowledge of actual falsity is not even required; a conviction can be based on a finding that the defendant acted with reckless disregard of whether a statement was true and with a conscious purpose to avoid learning the truth. United States v. Sarantos, 455 F.2d 877 (2d Cir. 1972); United States v. Egenberg, 441 F.2d 441 (2d Cir.), cert. denied, 404 U.S. 994, 92 S.Ct. 530, 30 L.Ed.2d 546 (1971). Alternatively, the evidence overwhelmingly supports a finding of reckless disregard. As to element (3), an act is done "knowingly" if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason. Standard Oil Co. v. United States, 307 F.2d 120, 130 (5th Cir. 1962). An act is done "willfully" if done voluntarily and intentionally, and with the specific intent to do something the law forbids. United States v. Malinowski, 472 F.2d 850 (3d Cir. 1973); United States v. Couming, 445 F.2d 555

21. See United States v. Adler, 380 F.2d 917 (2d Cir. 1967), cert. denied, 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1968); United States v. Marchisio, 344 F.2d 653 (2d Cir. 1965).

22. It does not even matter whether the defendant presented the false statements to the federal agency; § 1001 prohibits making or using a false statement or document "in intended relationship to a matter within agency jurisdiction." Ebeling v. United Sttaes, 248 F.2d 429 (8th Cir.), cert. denied, 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 261 (1957), approved and followed in United States v. Waters, 457 F.2d 805 (3d Cir. 1972).

23. We convicted only where there was a false certification as to a matter required by the conditional commitment. We granted defendant's motion for judgment of acquittal on count 12 where, although a false certification was submitted as to the condition of the roof, the conditional commitment did not ask for a roofing certification. Where, however, a certification as to a particular item was re-

quired, we find that FHA would not have agreed to insure the mortgages without the certification. We further find that the FHA accepted the certifications. We note too that it is not even necessary for the agency to have relied upon or been influenced by the false statement at all. The test for materiality is whether the statement has a natural tendency to influence or be capable of influencing the agency, not whether it, in fact, did so influence it. United States v. Goberman, 458 F.2d 226 (3d Cir. 1972); Blake v. United States, 323 F.2d 245 (8th Cir. 1963). Defendant has argued that because the FHA circular letter (see n. 9) required that the purchaser or mortgage company obtain the certification, a certification obtained by the seller or broker is not material. However, as we have also noted, FHA was unaware of the true source of the certifications, and a party perpetrating a fraud cannot be heard to say that the document he procured and substituted for a genuine one in order to perpetrate the fraud is not material.

(3d Cir.), cert. denied, 404 U.S. 949, 92 S.Ct. 291, 30 L.Ed.2d 266 (1971); United States v. Viticello, 363 F.2d 240 (3d Cir. 1966). We find that defendant acted knowingly and willfully as these terms have just been defined. Our conclusion is, upon review, more than amply supported by the evidence. We refer not only to the specifics recited at length with respect to each count of conviction, but also the background facts recited at the outset, which demonstrate the consistent pattern of defendant's operation from which, alone, knowledge and willfulness can be inferred.

### III. *The Indictment*

Chapter 47 of title 18, United States Code, contains two provisions prohibiting the conduct which we have found the defendant to have committed. As noted above, § 1001 generally prohibits making false statements to the government; § 1010 specifically prohibits making false statements to the Department of Housing and Urban Development, FHA's parent agency.[24] The defendant argues that under settled principles of statutory construction, when a specific statute and a general statute both prohibit the same conduct, only the specific statute is applicable, because it is considered to create an exception to the general statute. And, in defendant's view, the argument has special force because here the penalty imposed under the specific section is less than that prescribed by the general section.[25]

Defendant cites Robinson v. United States, 142 F.2d 431 (8th Cir. 1944).

That decision contains broad language declaring that "general language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." Thus, claims the defendant, § 1010, not § 1001, prohibits the making of false statements to the FHA. Defendant points out that other FHA cases are brought under § 1010 and there was no reason to handle his case differently. We have considered defendant's argument with the utmost care and attention and, while we cannot disagree that § 1010 might have been used by the government in this case, we have concluded that for several reasons defendant cannot prevail.

*Robinson* and the other cases we have found uniformly focus not on whether a conviction under a general statute can stand, but rather on severity of the sentence. Thus, in *Robinson*, where the defendant stole Post Office property, the court decided that he could not be sentenced to up to ten years under the general statute prohibiting larceny of government property, but rather could be given only a maximum of three years under the specific statute covering larceny of Post Office property. United States v. Kenny, 462 F.2d 1205, 1215 (3d Cir.), cert. denied, 409 U.S. 914, 93 S.Ct. 233, 234, 34 L.Ed.2d 176 (1972), held that defendants were not prejudiced by convictions under two conspiracy statutes for one conspiracy where the sentence imposed did not exceed the

24. Section 1010 reads as follows:
   Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Department of Housing and Urban Development for insurance, or for the purpose of obtaining any extension or renewal of any loan, advance of credit, or mortgage insured by such Department, or the acceptance, release, or substitution of any security on such a loan, advance of credit, or for the purpose of in-

   fluencing in any way the action of such Department, makes, passes, utters, or publishes any statement, knowing the same to be false, or alters, forges, or counterfeits any instrument, paper, or document, knowing it to have been altered, forged, or counterfeited, or willfully overvalues any security, asset, or income, shall be fined not more than $5,000 or imprisoned not more than two years, or both.

25. The maximum penalty for violation of § 1001 is five years' imprisonment and $10,000; of § 1010, two years and $5,000.

maximum under one of the conspiracy sections. To the same effect is Commonwealth v. Phillips, 215 Pa.Super. 5, 257 A.2d 81 (1969), cited in defendant's brief, which held that a defendant convicted of larceny and receiving stolen goods may not be sentenced for both offenses. Neither *Kenny* nor *Phillips* supports the defendant's contention, for we contemplate sentencing defendant to less than the penalty provided in § 1010, thus fully satisfying the line of cases cited to us. *Cf.* Mitchell v. Fiore, 470 F.2d 1149, 1153–1154 (3d Cir. 1972), in which the court held that a contempt defendant's right to jury trial was measured by the sentence actually imposed, as opposed to that which might have been imposed, and reduced the sentence imposed to make the denial of jury trial proper.

The cases cited in *Robinson* are also inapposite to the case before us. United States v. Zenith Radio Corp., 12 F.2d 614 (N.D.Ill.1926), held that violation of an administrative regulation authorized by statute could not be prosecuted under the more severe penalties of a separate "general, indefinite, and ambiguous" section of the same statute. D. Ginsberg & Sons, Inc. v. Popkin, 285 U.S. 204, 52 S.Ct. 322, 76 L.Ed. 704 (1932), held that a section of the Bankruptcy Act exempting the bankrupt from arrest prevailed over a general section of that Act giving the bankruptcy court power to make orders and issue process as necessary to effectuate the Bankruptcy Act. Thus the holdings of the cases on which defendant relies are much narrower than their sweeping dicta on statutory construction.

The defendant has also directed our attention to United States v. Quirk, 167 F.Supp. 462 (E.D.Pa.1958), aff'd per curiam, 266 F.2d 26 (3d Cir. 1959). There Judge Kraft held that it was proper to charge the defendant with a violation of § 1001 rather than 38 U.S.C. § 715, a lesser and more specific offense which he had violated by the same conduct, because willfulness was an element of the more serious charge and the government was prepared to prove willfulness. Defendant argues that the essential elements of §§ 1001 and 1010 are identical and that *Quirk* therefore implies that the government cannot choose between the two. However, that conclusion does not follow inexorably from *Quirk*, for the difference between the two statutes involved there allowed Judge Kraft and the Court of Appeals to avoid the issue now presented to us, rather than decide it. We cannot simply assume that *Quirk* would have been decided the other way had the elements of the two offenses been identical.[26]

Having dealt with defendant's cited authorities, we turn to an unbroken line of precedent that guides us to decide

---

26. Defendant's argument from *Quirk* is, as noted, founded on the premise that §§ 1001 and 1010 both require a showing of willfulness and of materiality. While we agree with this premise, it is worth noting that it is not entirely free from doubt. The willfulness requirement of § 1010 does not derive from the text of the statute. Similarly, materiality is not a textual element of § 1010 or of the second clause of § 1001, although the first clause does use the word "material." The fact that § 1010 is a felony statute requires that the element of willfulness be read into it. *See* United States v. Eisenmann, 396 F.2d 565, 566 & n. 1 (2d Cir. 1968). As to materiality, only the Second Circuit espouses the view that no materiality is required by § 1001. *See* United States v. Marchisio, 344 F.2d 653, 666 & n. 9 (2d Cir. 1965); United States v. Quirk, 167 F.Supp. 462, 464 & n. 3 (E.D.Pa. 1958), aff'd per curiam, 266 F.2d 26 (3d Cir. 1959). Materiality was read into § 1010 in Gevinson v. United States, 358 F.2d 761, 763 (5th Cir. 1966), cert. denied, 385 U.S. 823, 87 S.Ct. 51, 17 L.Ed.2d 60 (1967), and while we believe materiality is required, it is unnecessary to so hold in this case because materiality was in fact proved. Conceivably the lesser penalty prescribed by § 1010 reflects a Congressional intent to posit lesser requirements. But if either willfulness or materiality need not be proved in connection with a prosecution under § 1010, then a § 1001 prosecution would require greater proof and defendant's argument would fail because *Quirk* would control.

against him. In United States v. Gilliland, 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598 (1941), the Supreme Court considered the effect of an overlap between a general and a specific statute. That case involved the predecessor statute to § 1001 and the "Hot Oil" Act, which prohibited the interstate transportation of certain oil and authorized the President to prescribe regulations for enforcement; regulations were adopted requiring filing of monthly report forms. The defendant was indicted under § 1001, which carried a heavier penalty than the Hot Oil Act, for filing false reports. Chief Justice Hughes denied defendant's claim that he could be charged only under the more specific statute:

> In the light of the text of the Act of 1934, amending Section [1001], and its legislative history [the amendment broadened the coverage of the statute from false statements intended to cheat and swindle the government to false statements made in any matter within the jurisdiction of a government agency], it is also clear that the fact that the penalty prescribed by Section [1001] was greater than that fixed by the [Hot Oil Act] has no significance in connection with the construction and application of the former. The matter of penalties lay within the discretion of Congress. Section [1001] covered a variety of offenses and the penalties prescribed were maximum penalties which gave a range for judicial sentences according to the circumstances and gravity of particular violations.

Similarly lacking in merit is the contention that the [Hot Oil Act] operated to repeal Section [1001] as amended in 1934, so far as the latter applied to affidavits, documents, etc., presented in relation to "hot oil". There was no express repeal and there was no repugnancy in the subject matter of the two statutes which would justify an implication of repeal. The Act of 1934 with its provision as to false and fraudulent papers, has its place as a fitting complement to the

[Hot Oil Act] as well as to other statutes under which, in connection with the authorized action of governmental departments or agencies, the presentation of affidavits, documents, etc., is required. There is no indication of an intent to make the [Hot Oil Act] a substitute for any part of the provision in Section [1001].

312 U.S. at 95–96, 61 S.Ct. at 523. We agree with the opinion in Ehrlich v. United States, 238 F.2d 481, 485 (5th Cir. 1956), that the *Gilliland* decision settles the rule that the government may elect, where a single act violates more than one statute, to prosecute under either. As the Second Circuit wrote in United States v. Eisenmann, 396 F.2d 565, 568 (1968):

> There are many acts which are made criminal by two or more sections of the Code, and if the government chooses to prosecute the actor under the section providing the harsher penalty, he cannot complain.

With respect to the scope of § 1001 specifically, a line of cases has permitted the government to charge a violation of § 1001 where a more specific statute was also violated. United States v. Chakmakis, 449 F.2d 315 (5th Cir. 1971), upheld a § 1001 (felony) conviction of a doctor guilty of Medicare fraud, a misdemeanor under 42 U.S.C. § 408(c), noting that his sentence was within the maximum prescribed by the lesser statute. United States v. Eisenmann, *supra,* upheld a § 1001 conviction of an Internal Revenue agent who had also violated 26 U.S.C. § 7214(a)(7), a more specific statute carrying a heavier penalty. United States v. Matanky, 346 F.Supp. 116 (C.D.Cal.1972), was on all fours with *Chakmakis, supra.* In a lucid opinion disposing of the defendant's argument that he had been prosecuted under the wrong statute, Judge Gray explained that the *Robinson* rule relied on by the defendant is a rule recognizing that repeals can be effected *sub silentio* when the legislative history indicates an intended repeal, or when an older gener-

al statute and a newer specific statute are clearly inconsistent, or when the later statute is clearly intended as a substitute for the earlier one. We have seen not even a fleeting indication, let alone a clear one, that such is the case with §§ 1001 and 1010.

■ A second reason the government was entitled to indict under § 1001 was that it may not have been certain of its ability to prove knowledge on the part of all defendants and unindicted accomplices that the certifications were to go to the FHA. In fact at the trial it developed that at least one of the contractors knew that the certifications were to be used in connection with some government program but did not know which agency or even which level of government was involved. Thus the government faced a potential problem in proving the requisite scienter under § 1010. To sustain the defendant's position would be to hold that a person who prepares a false certification knowing it will be used by some government agency but not knowing it will be sent to the FHA commits no crime if it is actually sent to the FHA because he lacks scienter under § 1010 and cannot be charged under § 1001 since the FHA is involved. Similarly, to the extent the government sought to convict defendant as an aider and abettor, the violations committed may have been only § 1001 violations.

A third reason the defendant's argument must fail is that the *Robinson* rule refers to different parts of "the same enactment," which is not the situation here. Section 1001 has old origins and derives from R.S. § 5438, having been a part of title 18 in the 1940 edition of the United States Code. Section 1010 derives from § 1731(a) of title 12, United States Code (1940 ed.), the Banking title. The two sections were placed in chapter 47 of 18 U.S.C. only when the Revised Criminal Code was adopted by Congress, Act of June 25, 1948, ch. 645.

While that Act was a single enactment, we do not believe a massive recodification is the kind of single enactment contemplated in the rule stated in *Robinson*.

## IV. *Conviction of Aiding and Abetting Where the "Principals" Were Not Convicted*

The final point raised by defendant is his contention that it was error to convict defendant of aiding and abetting his codefendants when the government did not succeed in convicting any of them as principals. Consideration of this argument requires a brief review of the language of the indictment and the evidence.

■■ The various counts of the indictment are framed in language charging that defendant and various tradesmen made false representations or caused them to be made "in that" the tradesmen knew the certifications to be false. We have already found that in each case the tradesman involved knew that the certification was false. In each of counts 3, 4, 5, 7, and 14 we found that Clearfield induced the contractor to make a false certification by assuring him that necessary repairs would be performed, or, in one case, by assuring him that a property to which he could not gain access was in good condition. With respect to counts 8 and 16, involving "Ben Johnson," defendant induced Ellsworth Williams to make certifications which were false because there was no Ben Johnson and because the condition of the property was not as certified. Defendant then knowingly and willfully caused each of the certifications to be submitted to FHA. Such conduct makes defendant punishable as a principal within the meaning of 18 U.S.C. § 2(a), for he induced and procured the making of false certifications by others.[27] It may also be said that defendant willfully caused false certifications to be made by others, the making of which by him per-

27. (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or pro- cures its commission, is punishable as a principal.

sonally would have been a violation of law, making him punishable as a principal under 18 U.S.C. § 2(b) as well.[28] *Cf.* United States v. Glasso, 356 F.Supp. 814, at 819 (E.D.Pa.1973). Moreover, defendant aided and abetted, within the language of § 2(a), Nussbaum, Kelley, and Williams in their making of false certifications by arranging to have them submitted to the FHA. The situation in this case was similar to that in United States v. Provenzano, 344 F.2d 678 (3d Cir.), cert. denied, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964), a Hobbs Act case, wherein the Third Circuit remarked, "Where more than one actor is involved in an alleged violation of [a] section, all contributing in varying degrees to the success of the operation, the distinction between principal actors and aiders and abettors in the enterprise is somewhat illusory. The present case typifies just such a situation." 334 F. 2d at 691.[29]

Finally, defendant has argued that no conviction for aiding and abetting may stand where the principal was acquitted. The proper rule is set forth in United States v. Provenzano, *supra*:

> The general rule is that in order to convict a defendant of aiding and abetting the commission of a substantive offense, the proof must establish that the crime in question was committed by someone and that the person charged as an aider and abettor, aided and abetted in its commission. It is not prerequisite to the conviction of the aider and abettor that the principal be tried and convicted or in fact even be identified.

334 F.2d at 691 (citations omitted). In view of the Third Circuit cases we have cited, defendant can derive no comfort from the rule stated in United States v. Shuford, 454 F.2d 772, 779 (4th Cir. 1971), that "where the only potential principal has been acquitted, no crime has been established and the conviction of an aider and abettor cannot be sustained." Moreover, defendant was convicted only on counts involving certifications by Nussbaum (counts 3, 7), Kelley (4, 5, 14), and Johnson (8, 16), and neither Kelley, Nussbaum, nor "Ben Johnson" was acquitted of the charges at the time of trial or thereafter, so that the *Shuford* rule would be inapplicable to defendant. In United States v. Carter, Crim. No. 70–493 (E.D.Pa.Jan. 10, 1973), it was held that later dismissal of the case against the principals (which is the case with respect to Kelley) does not alter the result. All that is necessary is that a crime be committed by someone in order to try the aider and abettor.

## V. *Conclusion*

Having found that there was sufficient evidence to sustain the conviction, and that the remainder of defendant's arguments are lacking in merit, we enter the following Order.

## ORDER

And now, this 25th day of April 1973, defendant's motions for a new trial and arrest of judgment are denied. The Probation Department shall prepare a presentence report and the defendant shall appear for sentencing on May 17, 1973, at 9:00 a. m. in Courtroom 14.

28. (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

29. Even if we had found defendant guilty only under the substantive section and not under section 2 also, the Third Circuit held in *Provenzano* that proof of aiding and abetting will sustain an indictment charging only the substantive offense in question. This rule was applied in a § 1010 case, where aiding and abetting was also not charged, in United States v. Heithaus, 377 F.2d 484 (3d Cir. 1967). Here, of course, the indictment charged violations of both sections 1001 and 2.