837 F.2d 1519
 UNITED STATES of America, Plaintiff-Appellee,
v.
Thomas Manfred NELSON, a/k/a "Nellie", Roger S. Scott, Frank
Robert Guido, Jr., Lee H. Waldhart, a/k/a "Mr. Skimo", a/k/a
"Tom Burch", William Bruce Arnett, a/k/a "Jeremy", a/k/a
"Buzzy", Defendants-Appellants.
 No. 86-3476.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 25, 1988.
 
 Alan R. Parlapiano, Fine Farkash & Parlapiano, P.A., Gainesville, Fla., for Scott.
 James W. Reilley, Des Plaines, Ill., for Guido.
 Robert Augustus Harper, Tallahassee, Fla., for Waldhart.
 Alvin E. Entin, Entin, Schwartz, Barbakoff & Schwartz, Stephen A. LeClaire, Miami, Fla., for Arnett.
 William F. Rucker, Atlanta, Ga., for Nelson.
 Barbara Schwartz, Asst. U.S. Atty., George Blow, Tallahassee, Fla., for U.S.
 Appeal from the United States District Court for the Northern District of Florida.
 Before VANCE and HATCHETT, Circuit Judges, and O'KELLEY*, District Judge.
 HATCHETT, Circuit Judge:
 
 
 1
 In this drug conspiracy case, we apply the teachings of Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), and order that the appellants be afforded relief from the government's breach of their plea agreements through specific performance of the agreements. We affirm in part, reverse in part, and remand.
 
 
 2
 On December 18, 1985, a federal grand jury in the Northern District of Florida returned a thirty-nine count indictment against fifteen co-defendants, charging them with violations of federal narcotics and tax laws. Five of these persons, appellants, Thomas Nelson, Lee Waldhart, William Arnett, Frank Guido, and Roger Scott, entered into written plea agreements with the government whereby they agreed to plead guilty to certain charges in exchange for the government's promise not to deviate from a statement of stipulated facts which set forth the extent of each appellant's unlawful conduct. Pursuant to the agreements, the appellants pleaded guilty and were sentenced.
 
 
 3
 In this appeal, the appellants, Guido, Waldhart, Scott, Nelson, and Arnett challenge their sentences on various grounds. Specifically, Guido, Scott, and Nelson contend that the government breached the plea agreements and that the district court erred by refusing to grant their motions to either (1) require specific performance of the plea agreements, or (2) permit them to withdraw their guilty pleas. Arnett contends that the district court erred by failing to state objective facts on the record to substantiate the sentence imposed. Waldhart contends that the district court erred by refusing to suppress certain wiretap evidence.
 
 I. The Plea Agreements
 
 4
 Upon the conclusion of pretrial proceedings, the government entered into separate plea agreements with Guido, Scott, and Nelson, which stipulated to the extent of each appellant's illegal conduct as it related to the charges in the indictment. The district court accepted the appellants' guilty pleas and ordered presentence investigation (PSI) reports. Included in the PSI reports is a Statement of Facts which discusses the illegal conduct of each of the appellants in the drug conspiracy from 1973 until the time of the indictment. Based upon the facts stated in the Statement of Facts, appellants filed motions to have the plea agreements specifically performed or to have the pleas withdrawn. The motions were based on the ground that the Statement of Facts in the PSI reports (1) presented information irrelevant to the appellants' individual involvement and culpability, or (2) presented allegations that expanded the appellants' role in the conspiracy in violation of the stipulated facts in the plea agreements.
 
 DISCUSSION
 
 5
 Our discussion of the plea agreements in this case commences with the seminal decision of Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). The principle to be derived from Santobello is "that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." Santobello, 404 U.S. at 262, 92 S.Ct. at 499; see also United States v. Grandinetti, 564 F.2d 723, 725-26 (5th Cir.1977). In determining whether the terms of a plea agreement have been violated, this court must determine whether the government's conduct is inconsistent with what was reasonably understood by the defendant when entering the plea of guilty. In Re Arnett, 804 F.2d 1200, 1203 (11th Cir.1986); Johnson v. Beto, 466 F.2d 478, 480 (5th Cir.1972). If disputed, we determine the terms of the plea agreement according to objective standards. Arnett, 804 F.2d at 1202; see also United States v. Travis, 735 F.2d 1129, 1132 (9th Cir.1984).
 
 A. Nelson's Plea Agreement
 
 6
 In subsection 4(b) of Nelson's plea agreement, pursuant to which he pleaded guilty to conspiracy to possess with intent to distribute controlled substances in violation of 21 U.S.C. Secs. 841(a)(1) and 846, Nelson and the government stipulated to the following facts:
 
 
 7
 1. That the commencement date of this conspiracy as regards the Defendant Nelson is July 1978.
 
 
 8
 2. That the conclusion of this conspiracy as regards the Defendant Nelson is August 1984.
 
 
 9
 3. That the Defendant Nelson possessed with the intent to distribute a quantity of marijuana more than 1,000 lbs. but less than 10,000 lbs. That this is a cumulative figure which encompasses the entire extent of the conspiracy as relates to Defendant Nelson contained in the indictment.
 
 
 10
 4. That the Defendant Nelson did not possess or distribute any cocaine during the course of this conspiracy as charged in the indictment.
 
 
 11
 The Statement of Facts in the PSI report states that "Nelson obtained blank birth certificates and furnished same to various individuals in the Guido organization for use in obtaining drivers licenses and vehicles in fictitious names." This statement is in direct contravention of the stipulated facts in Nelson's plea agreement. The district court stated that it would "strike from the PSI and not consider ... in its determination of [the] appropriate sentence, matters in reference to the blank birth certificates." This is not sufficient for two reasons. The first reason is because the Supreme Court in Santobello, 404 U.S. at 262-63, 92 S.Ct. at 498-99 vacated the conviction and remanded the case to the trial court, notwithstanding the sentencing judge's statement that the prosecutor's recommendation of a sentence, in violation of the terms of defendant's plea agreement, did not influence him in sentencing. The second reason is that this action by the district court does not bind probation and parole authorities. Hence, we hold that the district court erred by refusing to grant Nelson's motion to either withdraw his plea or have the plea agreement specifically performed.
 
 B. Scott's Plea Agreement
 
 12
 The relevant portions of Scott's plea agreement with the government provides as follows:
 
 STIPULATED FACTS
 
 13
 The parties agree and stipulate for the purposes of this plea, the presentence investigation, sentencing, and parole consideration to the following facts:
 
 
 14
 a. That the commencement date of this conspiracy as it regards ... the Defendant, ROGER S. SCOTT began in or about 1979.
 
 
 15
 b. That the conclusion of this conspiracy as it regards the Defendant, ROGER S. SCOTT is August of 1984.
 
 
 16
 c. That the conspiracy alleged in the Indictment relating to the Defendant, ROGER S. SCOTT's complete involvement encompasses a cumulative amount of marijuana over 1,000 lbs. and under 20,000 pounds and the possession of no cocaine with intent to distribute within the purposes of this conspiracy.
 
 
 17
 d. The parties agree that no other facts as they apply to quantity or identity of contraband substances are applicable; nor will they be submitted by the United States Attorney or any law enforcement agencies who participated in this investigation for the purposes of this plea, the presentence investigation, sentencing and parole consideration.e. The parties agree that any information submitted by the Defendant or his attorney or the Government and its agents in this case which alters the Defendant's culpability or role in the conspiracy beyond the facts stipulated in Paragraph (4.) STIPULATED FACTS violates this agreement.
 
 
 18
 Scott contends that the government violated the plea agreement by providing the Parole Commission, as well as the sentencing judge, with a Statement of Facts, which included allegations beyond those contained in the plea agreement. The government contends that the Statement of Facts is well within the bounds of the stipulated facts and, in the alternative, that even if some allegations are unrelated to Scott, they are nonetheless relevant because the government's theory of the case is that Scott was involved in a widespread conspiracy to distribute controlled substances.
 
 
 19
 The government's argument is not convincing. Throughout the Statement of Facts are numerous allegations from which one could infer that Scott's involvement in the drug conspiracy was much more extensive than that stipulated to in the plea agreement.
 
 
 20
 For instance, notwithstanding the unequivocal language in the plea agreement that Scott's involvement in the conspiracy did not involve the possession of cocaine or the intent to distribute the same, the Statement of Facts states:
 
 
 21
 During the 1978-80 time frame, Guido and James Forsman bought and sold marijuana and cocaine from Jeffry Quattry, Steve Crumpton, Roger Scott and others. Most of the drugs were delivered by Bruce Gustafson although some were delivered to New Jersey, North Carolina and Arizona. [Emphasis added.]
 
 
 22
 ....
 
 
 23
 During 1980 and 81, Matthew Hester delivered both marijuana and cocaine to New Jersey and Wisconsin (Bruce Gustafson) for Arnett and Guido, some of which was obtained from Roger Scott. [Emphasis added.]
 
 
 24
 ....
 
 
 25
 In September 1981, up until sometime in 1983, Ralph Crumpton and Steve Angelini were delivering cocaine to Colorado for Jim Forsman and Frank Guido. Crumpton also began delivering car loads of marijuana to Bruce Gustafson in Wisconsin. Ralph Crumpton made approximately fifteen to twenty trips with the last one containing approximately 80 lbs. of money (probably in excess of $1 million). [Emphasis added.][1]
 
 
 26
 The references to cocaine involvement violate the letter and spirit of the plea agreement. In addition, the government's multiple references to marijuana involvement throughout the Statement of Facts implies that the total amount of marijuana with which Scott was involved exceeded the 20,000 pound limit stipulated to in the plea agreement.[2]
 
 C. Guido's Plea Agreement
 
 27
 The operative language of Guido's plea agreement provides as follows:
 
 
 28
 The parties agree and stipulate, for the purposes of this plea, the presentence investigation, and the Parole Board to the following facts:
 
 
 29
 (1) The Defendant GUIDO conspired with other individuals, both named and unnamed, to possess with intent to distribute controlled substances....
 
 
 30
 (2) The amount of marijuana involved, as aforesaid, was 20,000 pounds. This is a cumulative figure which encompasses the entire extent of the conspiracy as it relates to the Defendant GUIDO in this INDICTMENT.
 
 
 31
 (3) The amount of cocaine involved, as aforesaid, was 9 kilos of cocaine at 45% purity. This is a cumulative figure which encompasses the entire extent of the conspiracy as it relates to the Defendant GUIDO in this INDICTMENT.
 
 
 32
 ....
 
 
 33
 (1) That in September of 1981, in Levy County, Florida, the Defendant manufactured and possessed with intent to distribute, a quantity of marijuana [20,000 pounds] by growing same on property located there in Levy County, Florida.
 
 
 34
 e. The parties agree that any information submitted by the Defendant or his attorney or the Government and its agent in this case, which alters the Defendant's culpability or role beyond the facts stipulated herein, violates this agreement.
 
 
 35
 As with the plea agreements previously discussed, we hold that the government's Statement of Facts misrepresented Guido's culpability in the conspiracy beyond the facts stipulated to in his plea agreement.
 
 
 36
 For instance, although the plea agreement specifies that the total amount of marijuana involved in the conspiracy, as it relates to Guido, was 20,000 pounds, the Statement of Facts is replete with references to marijuana from which one could reasonably infer that Guido's involvement in the conspiracy was much more extensive than the stipulated amount of 20,000 pounds. The Statement of Facts alleges, among other things, that:
 
 
 37
 A 275 pound marijuana deal in Atlanta was also revealed by the wire which involved Frank Guido....
 
 
 38
 ....
 
 
 39
 On June 26, 1985, search warrants were executed on the Clay County property ... and a stash house in Riviera Beach (This is the house [in which] Guido's paramour resided).... The search of the house revealed approximately $404,000 and 850 lbs. of marijuana....
 
 
 40
 ....
 
 
 41
 From at least 1981 through 1984, Guido was having both cocaine and marijuana shipped by vehicle from Florida to Wisconsin on a regular basis and approximately 20 to 30 such trips were documented. The shipments were usually four to five hundred pounds of marijuana and from ounces to kilo quantities of cocaine.
 
 
 42
 ....
 
 
 43
 During 1982, Angelini was involved with GUIDO and others in a marijuana deal in North Carolina where approximately 1,000 pounds of marijuana was taken to both Wisconsin to Florida.
 
 
 44
 ....
 
 
 45
 [Phillip Gordon Buscher] ... was involved in obtaining several loads of marijuana from Frank Guido in 1984 including the Lee Herbert Waldhart deal which involved 463 pounds of marijuana and $190,000.
 
 
 46
 Jeff Quattry was involved in the marijuana growing operation with FRANK GUIDO that was aborted in Polk County, Florida, in 1982.... During 1982, he was involved in picking up 1500 pounds of marijuana in Davie, Florida, which marijuana was transported to the Gainesville, Florida, area for FRANK GUIDO.
 
 
 47
 In addition to the allegations recited above, the Statement of Facts also alleged that Guido was involved in a substantial number of other marijuana transactions in Levy County, Florida, involving at least 13,500 marijuana plants, and also Clay County, Florida, involving at least 1,200 marijuana plants. Furthermore, while the plea agreement stipulated that Guido grew marijuana on property located in Levy County, the Statement of Facts alleges that Guido grew or intended to grow marijuana on property located in Levy County, Clay County, Alachua County, and Polk County. Finally, we note a third violation of the plea agreement in that the Statement of Facts alleges that Guido made both direct and indirect threats against government witnesses during the course of the investigation which gave rise to the indictment. This allegation is in clear contravention of the plea agreement because the stipulated facts do not mention threats made by Guido against government witnesses.
 
 
 48
 Having decided that the government has breached the terms of the plea agreements, the question remains whether appellants are entitled to have their original plea agreements specifically performed, or should be permitted to withdraw their guilty pleas. "Where the government has not honored a plea agreement, the fashioning of an appropriate remedy is left to the sound discretion of the court." In Re Arnett, 804 F.2d 1200, 1204 (11th Cir.1986) (citing Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971)). In Santobello, the Court outlined two remedies which are available to a defendant whose plea agreement has been violated: (1) "specific performance of the agreement on the plea, in which case [the defendant] should be resentenced by a different judge," or (2) affording the defendant "the opportunity to withdraw his plea of guilty." Santobello, 404 U.S. at 263, 92 S.Ct. at 499.[3] Although Guido urges that he be allowed to withdraw his guilty plea, we deem specific performance to be the appropriate remedy in all three cases. Accordingly, we hold that appellants are entitled to specific performance of their respective plea agreements before a different sentencing judge. See United States v. Shanahan, 574 F.2d 1228 (5th Cir.1978) (remanding for resentencing by another district judge); United States v. Grandinetti, 564 F.2d 723, 727 (5th Cir.1977) (same).
 
 II. Judicial Vindictiveness
 
 49
 Prior to sentencing but after the district court accepted his plea, the government served on Arnett an in rem forfeiture complaint seeking forfeiture of his house and farm located in North Carolina. Arnett argued that the attempt to gain forfeiture of the North Carolina property constituted a violation of the terms of his plea agreement which provided in relevant part:
 
 FORFEITURES
 
 50
 The defendant Arnett agrees to the forfeiture to the United States of the Three Thousand dollars on his person at the time of his arrest.
 
 
 51
 This is the entire agreement between defendant William Bruce Arnett, and the prosecution, and it has been entered into freely, voluntarily and upon advice of counsel.
 
 
 52
 Accordingly, during a hearing before the district court, Arnett sought specific performance of the plea agreement, or alternatively, to vacate the guilty plea. The district court denied his request. Arnett filed a petition for writ of mandamus or prohibition in this court. In granting mandamus relief, this court held:
 
 
 53
 Arnett has suffered no prejudice to date from the filing of the complaint for forfeiture of his farm. It is appropriate, therefore, to allow the United States Attorney to cure the breach of the plea bargain by withdrawing the forfeiture action against Arnett's house and farm. Should the government elect to pursue its action for forfeiture, the district court is directed to grant Arnett's motion to vacate his plea.
 
 
 54
 In Re Arnett, 804 F.2d 1200, 1204 (11th Cir.1986).
 
 
 55
 Pursuant to the granting of the petition for mandamus, the district court entered an order dismissing the government's in rem forfeiture complaint. At the time of sentencing, however, the court imposed a $100,000 fine which is approximately equal to the value of the North Carolina property.
 
 
 56
 Arnett, relying upon North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) and its progeny, now argues that a presumption of vindictiveness should attach to the district court's imposition of the $100,000 fine because the fine was simply another way for the district court to accomplish what it had previously been prohibited from doing. Pearce teaches that in order to avoid retaliatory motivation on the part of a sentencing judge, "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear [in the record]." Pearce, 395 U.S. at 726, 89 S.Ct. at 2081. Arnett, conceding that he is unable to demonstrate actual vindictiveness, contends that a presumption of vindictiveness is appropriate because the district court did not state articulable, objective, and reviewable facts on the record to support the sentence imposed.
 
 
 57
 The government responds that Pearce and the other cases relied upon by Arnett are inapposite because Arnett was never resentenced; therefore, no sentence enhancement occurred. In Pearce, the government argues, the defendants had been sentenced, granted a new trial, reconvicted, and then resentenced to longer terms of incarceration without any articulable justification. In this case, the government argues, the district court withheld sentencing, at Arnett's request, so that Arnett could pursue an interlocutory appeal to challenge the government's attempted forfeiture of the North Carolina property. The district court acquiesced in Arnett's request. We agree with the government that Arnett may not now claim that the district court was vindictive simply because he is dissatisfied with the sentence imposed.[4]
 
 III. Wiretap Evidence
 
 58
 During the investigation in this case, state and federal authorities obtained a wiretap order from the Chief Judge of the Fourth Judicial Circuit of Florida which permitted them to install wiretap devices on telephone facilities located in Clay County, Florida. Florida's Fourth Judicial Circuit is composed of Clay, Duval, and Nassau Counties. Waldhart argues that although the wiretap order issued by the circuit judge permitted authorities to install wiretap devices on telephone facilities located in Clay County, the order did not reflect that any wiretapping devices would be located outside the territorial jurisdiction of the Fourth Judicial Circuit. Nonetheless, Waldhart argues, law enforcement authorities proceeded to install wiretap devices on telephone lines in Clay County which permitted them to transmit the signals back to their offices in Alachua County. Alachua County is not located in the Fourth Judicial Circuit; it is located in the Eighth Judicial Circuit. Thus, Waldhart contends that all aural acquisitions and recordings of telephone conversations which are at issue in this case were actually intercepted in Alachua County, Florida, territory over which the circuit judge who issued the wiretap order lacked "territorial jurisdiction."
 
 
 59
 The government argues that both state and federal laws define the term "intercept" to mean "the aural acquisition of the content of any ... communication...." 18 U.S.C. Sec. 2510(4); Fla.Stat. Sec. 934.02(3). The government relies upon a decision of the former Fifth Circuit where the court, in stating the meaning of the term "intercept" as used in Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. Secs. 2510-2520, stated that "interception" refers to the acquisition of a communication as well as the "initial acquisition by the [recording] device and the hearing of the communication by the person or persons responsible for the recording."[5] United States v. Turk, 526 F.2d 654 (5th Cir.), cert. denied, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976) (emphasis added). Significantly, the government argues, the court in Turk recognized that communications which are recorded but are not actually heard are still regarded as "aurally acquired."
 
 
 60
 We agree with the government's argument that the term "intercept" as it relates to "aural acquisitions" refers to the place where a communication is initially obtained regardless of where the communication is ultimately heard. In addition, Waldhart's claim is foreclosed by our recent decision in Adams v. Lankford, 788 F.2d 1493 (11th Cir.1986). In Adams, a state prisoner alleged a violation of Title III because "the district attorney who applied for [a wiretap] order and the judge that authorized the wiretap were not in the same county as some of the tapped telephones." We denied relief, holding that territorial jurisdictional limitations did not implicate Congress's core concerns in passing Title III. Adams, 788 F.2d at 1498-99. Accordingly, the district court properly denied Waldhart's motion to suppress the wiretap evidence.
 
 
 61
 We have considered other issues presented by appellants and find them to be without merit.
 
 CONCLUSION
 
 62
 In summation, we hold (1) that the government breached the respective plea agreements by submitting a Statement of Facts in the presentence investigation reports which represented the culpability of the appellants beyond the facts stipulated to in the plea agreements (new sentencing hearings); (2) that Arnett's judicial vindictiveness claim fails (judgment affirmed); and (3) that territorial limitations do not implicate a core concern of the federal wiretap statutes (Waldhart judgment affirmed).
 
 
 63
 Accordingly, the convictions, sentences, and judgments as to Arnett and Waldhart are affirmed.
 
 
 64
 As to Guido, Scott, and Nelson, their convictions are affirmed; their sentences are vacated, and the district court is directed to order specific performance of their plea agreements; thereafter, they should be sentenced by a judge other than the original sentencing judge.
 
 
 65
 AFFIRMED in part, REVERSED and VACATED IN PART, and REMANDED with directions.
 
 
 
 *
 Honorable William C. O'Kelley, U.S. District Judge for the Northern District of Georgia, sitting by designation
 
 
 [1]
 Although this paragraph does not mention Scott, the effect of this paragraph, when viewed in conjunction with the other allegations of Scott's cocaine involvement, is to imply that Scott may have also been involved in these transactions
 
 
 [2]
 The major reason for the appellants' decisions to enter guilty pleas was the offense severity rating which would be determined by the United States Parole Commission. For instance, based on the facts stipulated to in Scott's plea agreement, a federal probation officer estimated that the offense severity rating commensurate with those facts would be a Category 5. The same probation officer, however, wrote to the court in Scott's PSI that "the Parole Commission will in all probability consider [Scott's] overall involvement as opposed to the plea agreement specifying under 20,000 pounds." Thus, the cumulative effect of the multiple references to marijuana involvement throughout the government's Statement of Facts resulted in an offense severity rating at Category 6, rather than the Category 5 severity rating which the plea agreement suggested would have been appropriate
 
 
 [3]
 Justice Marshall, in a partial dissenting opinion in Santobello, concluded that a majority of the Court shared the view that the defendant's choice concerning the appropriate remedy for violation of a plea agreement should be binding on the Court. Santobello, 404 U.S. at 268 n., 92 S.Ct. at 502 n. (Marshall, J., concurring in part and dissenting in part). See also Santobello, 404 U.S. at 267, 92 S.Ct. at 501 (Douglas, J., concurring) ("In choosing a remedy [for violation of a plea agreement], a court ought to accord a defendant's preference considerable, if not controlling, weight inasmuch as the fundamental rights flouted by a prosecutor's breach of a plea bargain are those of the defendant, not of the State."). We are, of course, mindful of the inherent dangers in attempting to discern the holding of a majority opinion by extrapolating favorable language from a concurring or dissenting opinion. Significantly, the majority in Santobello did not hold that a defendant's choice of remedy for violation of a plea agreement is binding on the court. Hence, we exercise our discretion, as Santobello teaches, to order that appellants' plea agreements be specifically performed before a new sentencing judge on remand
 
 
 [4]
 During the sentencing hearings, the imposition of fines was based, in large part, upon the defendant's role in the drug conspiracy, the likelihood of his prior income coming mainly from profits derived as a result of the various drug transactions, and the district court's realistic assessment of the defendant's personal ability to pay. For instance, with reference to appellant Scott, the district judge stated:
 I have debated a fine. I cannot find in the PSI where he's got any assets that are not encumbered or I would have imposed a fine, because I believe he has obtained substantial monies over the years from this endeavor. I decline to impose a fine because I don't think it would be anything but, you know, a futile gesture.
 The only ground relied upon by Arnett in pressing his claim of vindictiveness is that the amount of the fine imposed, $100,000, was equal to the approximate value of the North Carolina property. We refuse to second-guess the motivations of the sentencing judge on the basis of such a dubious ground.
 
 
 [5]
 Title III of the 1968 Omnibus Crime Control and Safe Streets Act forbids the interception or disclosure of wire or oral communications and provides a procedure for law enforcement officials to intercept communications after receiving authority to do so