**UNITED STATES of America**

**v.**

**Ernest J. BADARACCO, Jr., Appellant.**

**No. 91–5484.**

United States Court of Appeals, Third Circuit.

Argued Oct. 15, 1991.

Decided Jan. 24, 1992.

As Amended Feb. 5, Feb. 24, and March 3, 1992.

Rehearing and Rehearing En Banc Denied Feb. 19, 1992.

**930**

Gerald D. Miller (argued), Miller, Meyerson, Schwartz & Corbo, Jersey City, N.J., for appellant.

Michael Chertoff, U.S. Atty., Leslie Faye Schwartz (argued), Asst. U.S. Atty., Office of U.S. Atty., Newark, N.J., for appellee.

Before SLOVITER, Chief Judge, and COWEN and WEIS, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Chief Judge.

Appellant Ernest J. Badaracco, Jr. pleaded guilty to four counts of bank fraud in violation of 18 U.S.C.A. § 1006 (West Supp. 1991) and 18 U.S.C. § 2 (1988). He appeals from the judgment of sentence imposing a 21 month term of imprisonment and an order that he make restitution to the Ely-

sian Savings Bank of Hoboken in the amount of $293,000.00.

We are asked to review the district court's application of the United States Sentencing Guidelines (U.S.S.G.) in (1) concluding that Badaracco was an "organizer" or "leader" for purposes of upward adjustment under U.S.S.G. § 3B1.1(c), (2) calculating Badaracco's base offense level under U.S.S.G. § 2F1.1(b), and (3) adjusting Badaracco's sentence upward under U.S.S.G. § 2F1.1(b)(2) based on the conclusion that the offense involved more than minimal planning. We are also asked to determine whether the government violated its promise under the plea agreement to stipulate that Badaracco's offense did not involve more than minimal planning, and whether the district court erred in ordering Badaracco to make restitution to the Elysian Savings Bank in the amount of $293,000.00. Finally, we consider Badaracco's claim that the district court threatened to retaliate against him at resentencing for taking an appeal to this court. Because Badaracco is currently serving his sentence we expedited the appeal to avoid mootness of any of the issues raised.

### I.

#### Facts

Between 1979 and 1987, Badaracco served as President and Chief Executive Officer of the Elysian Federal Savings Bank in Hoboken, New Jersey. During the same period, either Badaracco or a member of his family had an interest in three electrical companies: Badaracco Brothers Inc.; Bad–Mar, Inc.; and 1067 Electric. Presentence Report ¶ 11.[1] In his capacity as President and CEO of Elysian, Badaracco approved loans to several Hoboken developers on the condition that they distribute the electrical work required on their construc-

1. The facts are taken from the Presentence Report prepared by the United States Probation Office, the Superseding Indictment, and the transcript of Badaracco's guilty plea hearing. In its addendum to the Presentence Report, the Probation Office states that Badaracco "provided his objections to each paragraph of the Offense Conduct section of the presentence report. They are too numerous to put into this adden-

dum and a copy has been provided to the [district] court for consideration." Presentence Report at 29. Badaracco did not include a copy of these objections in the appendix to this appeal nor is there a copy in the record, which we have examined in full. Because our decision on the sentencing guidelines issues is based on facts which are not in dispute, there is no need to remand for a resolution of disputed facts.

tion projects to one or more of the three Badaracco family companies. Badaracco knew that his actions were against bank policy and misled the bank with the assurance that he had severed ties to the family electrical firms. The ten-count indictment against Badaracco was based on four of these transactions.

Counts 1–4 of the indictment were based on the development by Patricia Tuohy of "Crystal Condos" in Hoboken. Tuohy contacted Badaracco in the spring of 1984 to discuss financing for the acquisition and construction of the site. Badaracco promised that Elysian would finance the project provided that Tuohy enter into a partnership with Elysian's subsidiary, Elysian Financial Services Corporation (EFS). In May 1984, Tuohy and EFS entered into a partnership known as CJT Realty. Each partner held a fifty percent interest in the project, with Tuohy acting as manager of the construction project, and EFS taking a purely passive role. Badaracco was to perform inspections on the progress of the construction and to approve all draw downs from the construction loan. Presentence Report ¶¶ 13–14.

Elysian approved the construction loan for Crystal Condos in August 1984. The Presentence Report does not state the amount of the loan. After CJT Realty had purchased the property, Badaracco demanded that Tuohy hire Badaracco Brothers to do the electrical work on the project, even though another company had made the lowest bid. Tuohy objected to this demand because work performed by Badaracco Brothers for Tuohy on an earlier occasion had been unsatisfactory. When Badaracco threatened to withdraw Elysian's financing from all of Tuohy's construction projects, including Crystal Condos, if she did not meet his demand, Tuohy agreed to hire Badaracco Brothers. Presentence Report ¶ 15. The electrical contract was worth approximately $78,300 to Badaracco Brothers. Superseding Indictment, Count 1 ¶ 5; App. at 45.

For the next three years, Badaracco repeatedly interfered with the Crystal Condos project, which progressed slowly. Ba-daracco was abusive and threatening to Tuohy, warning her that: "I'm waiting for you to make one wrong move so I can foreclose on you." Presentence Report ¶ 16. In March 1985, Badaracco replaced Tuohy's construction foreman with his own man, Joseph Gorga. When Tuohy objected, Badaracco threatened again to withdraw Elysian's financing from all of her construction projects. After Gorga took over, Tuohy noticed that very little work was being done on Crystal Condos, despite the fact that significant draw downs were being made from the Crystal Condos construction loan. Tuohy believed that the money was being used to finance the Abbey, a construction project jointly owned by Gorga and EFS. Presentence Report ¶ 17.

In January 1986, Badaracco demanded that Tuohy sign a second construction loan in the amount of $600,000 to finish off the Crystal Condos project. Tuohy balked until Badaracco again threatened to foreclose or rescind the financing on all of her construction projects. In June 1987, after Gorga had been replaced by two successive construction foremen, Badaracco asked Tuohy to take over management of the project. Because Badaracco Brothers had not yet completed the electrical work, Tuohy sought a replacement contract to finish the work. App. at 32. She obtained an estimate from Pegasus Electric of $12,000. Badaracco suggested that Tuohy instead use Bad–Mar Electric for $19,000. In response to Tuohy's objection, Badaracco lowered the estimate to $16,000 and hired Bad–Mar to do the job without Tuohy's consent. Once again, Tuohy objected and Badaracco threatened to foreclose on the project if she did not accept Bad–Mar. Presentence Report ¶ 19.

Counts 5 and 6 of the indictment were based on a second Badaracco scheme, involving the development of the "Adams Street Project" in Hoboken. Some time in 1984, Badaracco asked developer Peter Belfiore and his partner Alan Richards to enter into a joint venture with EFS to develop a real estate project, in which EFS would be one partner and Belfiore and Richards the other. Richards proposed the Adams Street property for development

and Badaracco agreed. Badaracco decided that EFS should get a 60% interest in the project and Belfiore and Richards a 20% interest each. The property cost $540,000. Belfiore provided $40,000 of his own money and EFS provided $250,000. Belfiore and Richards were responsible for the remaining $250,000 of the mortgage amount. Presentence Report ¶¶ 20–21.

Belfiore and Richards were unable to obtain financing at any other local bank, apparently because of Badaracco's involvement in the project.[2] Thus, Elysian became the sole source of financing for the project in the amount of $3,405,000. Badaracco conditioned approval of the loan on the use of Badaracco Brothers for all of the project's electrical work, and refused to consider any competitive bidding. Belfiore reluctantly agreed to this demand because he did not want to jeopardize his financing. Shortly after construction began, Badaracco unilaterally hired 1067 Electric to do part of the electrical work on the project. Presentence Report at ¶ 22. Badaracco Brothers and 1067 Electric received approximately $175,000 worth of contracts from this project. App. at 47.

Like the Crystal Condos project, the Adams Street Project progressed slowly. Badaracco, the sole inspection and draw down authority on the construction loans, consistently underfunded the project. Presentence Report ¶ 22. In June 1985, after accusing Belfiore, who was acting as construction manager, of stealing construction materials, Badaracco replaced Belfiore with Gorga. When Belfiore objected, Badaracco threatened to rescind Elysian's financing of the project. Presentence Report ¶ 23. Gorga's first act as construction manager was to shut down the project. When construction was resumed, the number of workers had been dramatically cut, the rate of work was slow and its quality poor. Gorga also altered the construction plans. Belfiore believes that Gorga was attempting to make the Abbey project, which he owned jointly with EFS, more attractive than the Adams Street Project. Presentence Report ¶ 24.

Finally, in the fall of 1986, when the Adams Street Project was nearly complete, an EFS officer informed Belfiore that more money was needed to complete the project. She told him to sign a blank loan commitment with the dollar amount to be filled in later. When Belfiore refused, Badaracco threatened to foreclose on the project. Belfiore then signed a loan commitment for an additional $975,000. Presentence Report ¶ 25.[3]

Counts 9 and 10 of the indictment are based on loans made by Elysian "to a property located at 205–207 Fourteenth Street, Hoboken, New Jersey." Superseding Indictment, Count 9 ¶ 2. Badaracco Brothers received a $40,000 electrical contract from this deal. App. at 47–48. Although the Presentence Report states that counts 9 and 10 arose from the Crystal Condos scheme, this does not appear to be the case, judging from the dollar amount and address identified in the superseding indictment. There are no other facts before us about this scheme.

On August 2, 1990, Badaracco was charged by a grand jury with five counts of bribery, in violation of 18 U.S.C.A. § 215 (West Supp.1991) and 18 U.S.C. § 2 (1988), and five counts of bank fraud, in violation of 18 U.S.C.A. § 1006 (West Supp.1991) and 18 U.S.C. § 2 (1988). A nearly identical superseding indictment was filed on November 29, 1990. Badaracco pleaded guilty to four counts of bank fraud, and the government agreed to recommend that the court dismiss the remaining counts. The

---

**2.** United Jersey Bank signed a letter of intent to fund the project, but withdrew it upon learning of Badaracco's involvement. Crestmont Savings and Loan agreed to fund half of the construction loan with Elysian funding the other half. Crestmont backed out because Badaracco insisted that he be the sole draw down and inspection authority for the project and because Badaracco would not permit Crestmont to conduct independent inspections of the project before releasing any construction funds. Presentence Report ¶ 22.

**3.** Counts 7 and 8 of the Superseding Indictment were dismissed by the government as part of Badaracco's negotiated plea. Accordingly, they were not considered in the calculation of Badaracco's sentence. See U.S.S.G. § 1B1.2(a) (1990).

counts on which Badaracco stands convicted covered the Crystal Condos project (Counts 2 and 4), the Adams Street project (Count 6), and the Fourteenth Street project (Count 10).

The plea agreement provided that if Badaracco gave "substantial assistance" in other investigations and prosecutions, the government would move for a downward departure under U.S.S.G. § 5K1.1. The government also stipulated for sentencing purposes that Badaracco had accepted responsibility for his acts and that his conduct did not involve more than minimal planning. App. at 21–25.

The Presentence Report prepared by the United States Probation Office under the Sentencing Guidelines calculated the base offense level for violations of 18 U.S.C. §§ 1006 and 2 at six, U.S.S.G. § 2F1.1(a); increased the offense level by eight, on the theory that the total loss attributable to Badaracco's actions was $293,000, U.S.S.G. § 2F1.1(b)(1)(I); increased the offense level by two because it involved more than minimal planning, U.S.S.G. § 2F1.1(b)(2); increased the offense level by two based on a finding that the defendant was an organizer or leader of the crime charged, U.S.S.G. § 3B1.1(c); and increased the offense level by two because of Badaracco's abuse of a position of trust, U.S.S.G. § 3B1.3. Badaracco also received a two-level reduction for his acceptance of responsibility. The probation office determined Badaracco's final offense level to be eighteen. Because Badaracco had no criminal history he was in Criminal History Category I, and faced a sentence of imprisonment in the range of 27 to 33 months.

The district court agreed with the recommendations of the probation officer. The government moved for a downward departure of six months based on Badaracco's cooperation. The district court granted the departure, and sentenced defendant on June 11, 1991 to concurrent sentences of 21 months followed by concurrent three-year terms of supervised release for each of the four counts to which he pleaded guilty. The court also ordered defendant to pay $293,000 in restitution to the Elysian Bank.

On July 12, 1991, Badaracco began serving the custodial portion of his sentence.

We have jurisdiction over Badaracco's appeal from the district court's judgment of sentence pursuant to 18 U.S.C. § 3742(a) (1988) and 28 U.S.C. § 1291 (1988).

## II.

### Discussion

#### A.

#### Badaracco's Role in the Offense

When reviewing adjustments under the Sentencing Guidelines, we "exercise plenary review over legal questions about the meaning of the sentencing guidelines, but apply the deferential clearly erroneous standard to factual determinations underlying their application." *United States v. Inigo,* 925 F.2d 641, 658 (3d Cir.1991). "[W]hether a defendant receives a reduced or increased offense level based on his role in the offense" is a factual determination reviewable under the clearly erroneous standard. *United States v. Salmon,* 944 F.2d 1106, 1126 (3d Cir.1991).

Chapter 3, Part B of the Sentencing Guidelines provides for adjustment of a defendant's offense level on the basis of his or her role in the offense. Section 3B1.1 provides for an upward adjustment where the defendant played an aggravating role; section 3B1.2 provides for a downward adjustment where the defendant played a mitigating role; and section 3B1.3 provides for an upward adjustment where the defendant abused a position of trust or used a special skill. At issue in this appeal is section 3B1.1, which provides:

§ 3B1.1 *Aggravating Role*

Based on the defendant's role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five

or more participants or was otherwise extensive, increase by 3 levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

U.S.S.G. § 3B1.1 (1990).[4] Pursuant to U.S.S.G. § 3B1.1(c), the district court increased Badaracco's offense level by 2.

■ Adjustment under U.S.S.G. §§ 3B1.1 and 3B1.2 is permissible only where there is more than one "participant" in the offense. See U.S.S.G., Ch. 3, Part B, Introductory Commentary (1990); *United States v. Bierley*, 922 F.2d 1061, 1064–66 (3d Cir.1990). "Participant" is specifically defined in the Commentary to the Guidelines as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 Commentary, Application Note 1.[5]

In *Bierley*, we were obliged to construe the meaning of the term "participant" in the context of section 3B1.2, which authorizes a downward adjustment for a defendant who played a mitigating role in the offense because s/he was either a "minimal participant" or a "minor participant." The only person with whom Bierley had dealt was an undercover government agent. Because the agent was obviously not "criminally responsible," we held that he was not a "participant," and that section 3B1.2 was accordingly inapplicable. Other courts have reached the same conclusion with respect to section 3B1.1(c), the provision at issue in this case. See, e.g., *United States v. DeCicco*, 899 F.2d 1531, 1535–36 (7th Cir.1990); *United States v. Carroll*, 893 F.2d 1502, 1509 (6th Cir.1990).

Badaracco argues that the sentencing court should not have increased his offense level under section 3B1.1(c) because he acted alone. The government initially shared this view, and stated in its letter responding to the Presentence Report that "[a]ll evidence in this case indicates that the defendant acted alone in the commission of his crimes. To charge defendant as an organizer, leader, manager, or supervisor would constitute a legal impossibility." App. at 28. The government changed its position at the sentencing hearing, when it argued that the developers, although not criminally responsible, were participants for purposes of section 3B1.1(c). The government now concedes that any alleged participants must be criminally responsible before the upward adjustment may be applied, and accordingly argues for the first time that the developers were criminally responsible.

■ The district court concluded that the two-level adjustment under U.S.S.G. § 3B1.1(c) was appropriate because the developers were criminally responsible participants. The probation officer who prepared the Presentence Report viewed the developers as the victims of the dismissed counts. See Presentence Report ¶ 107. However, nothing in the Guidelines or in the case law interpreting them precludes a finding that an individual or entity was both a victim and a participant. We thus consider whether the developers were participants in the bank fraud.

As set forth above, to be considered a participant under the Guidelines an individual must be criminally responsible, *i.e.*,

---

**4.** Badaracco was sentenced on June 11, 1991. As required by the statute, 18 U.S.C. § 3553(a)(4)-(5) (1988), the district court applied the guidelines in effect at the time of sentencing, not the time of the crime. Unless otherwise indicated, all references to the Sentencing Guidelines in this opinion will be to those in effect at the time of sentencing.

**5.** In the 1991 amendments to the Sentencing Guidelines, the following sentence was added to the end of Application Note 1: "A person who is not criminally responsible for the commission of the offense (*e.g.*, an undercover law enforcement officer) is not a participant." U.S.S.G.

§ 3B1.1 Commentary, Application Note 1 (1991). The Commission explains that: "This amendment clarifies the operation of this guideline in accord with the holding in *United States v. Carroll*, 893 F.2d 1502 (6th Cir.1990)." U.S.S.G. appendix c at 240 ¶ 414 (1991). "While not critical to our outcome, we point out that [the] proposed amendment ... supports our result.... Inasmuch as the amendment to the guideline is intended to clarify the existing guideline, we may give it substantial weight in determining the meaning of the existing guideline." *United States v. Ofchinick*, 877 F.2d 251, 257 n. 9 (3d Cir.1989) (citation omitted).

s/he must have committed all of the elements of a statutory crime with the requisite *mens rea.* Neither the district court, in the course of the sentencing hearing, nor the government, during the sentencing hearing or in its brief, specified precisely the crime for which the developers were criminally responsible. The district court stated simply that the developers "knew what was going on" and that they "participated in this conduct." App. at 60. When pressed at oral argument, the government suggested that the developers could be guilty of either (a) aiding and abetting bank fraud or (b) bribery of a bank officer.

■ The government must prove by a preponderance of the evidence that the developers were criminally responsible participants if the upward adjustment is to stand. *See United States v. McDowell,* 888 F.2d 285, 291 (3d Cir.1989). Under the Guidelines, "the burden of ultimate persuasion should rest upon the party attempting to adjust the sentence. Thus, when the Government attempts to upwardly adjust the sentence, it must bear the burden of persuasion. This prevents the criminal defendant from having to 'prove the negative' in order to avoid a stiffer sentence." *Id.*

■ On the basis of the record before us, we conclude that the government has failed to carry its burden of showing that the developers were culpable. There is no evidence in the Presentence Report to suggest either that the developers knew that Badaracco had a personal interest in any of the three Badaracco companies, or that they knew he was concealing that interest from Elysian. Only by proving the existence of such knowledge could the government demonstrate that the developers had the "criminal state of mind" necessary to a conviction for aiding and abetting Badaracco's bank fraud. *See United States v. Grasso,* 356 F.Supp. 814, 819 (E.D.Pa.), *aff'd mem.,* 485 F.2d 682 (3d Cir.1973).

Nor has the government proved by a preponderance of the evidence that the developers are guilty of bribing Badaracco, the charge in the indictment counts that were dropped. Under 18 U.S.C. § 215,

(a) Whoever—

(1) corruptly gives, offers, or promises anything of value to any person, with intent to influence or reward an officer, director, employee, agent, or attorney of a financial institution in connection with any business or transaction of such institution

is guilty of bribery. 18 U.S.C.A. § 215 (West Supp.1991). The developers would be criminally responsible under section 215(a)(1) only if they were aware of Badaracco's interest in the three Badaracco companies. Otherwise, the developers could not have the intent required under section 215 to influence or reward Badaracco.

There is insufficient evidence in the Presentence Report to prove that the developers had the requisite knowledge. More importantly, there is no evidence that the developers understood that it was Badaracco, of his own accord, rather than the bank, through Badaracco, that conditioned the award of the loans on the use of those companies. The government conceded at argument, as it must, that there would be nothing illegal in the bank's conditioning the loans in this manner. Such a condition would be particularly unexceptional in the case of the Crystal Condos and Adams Street Project loans, in which Elysian acted as a partner and joint venturer, respectively. Under such circumstances, the bank could be expected to be particular about the contractors used by its borrowers.

Admittedly, an observer could infer from the circumstances that the developers might or should have known that there was something unsavory about their Elysian loans. However, an inference drawn by the government or the court after the fact about what suspicions the developers might or even should have had is not enough to conclude that those developers were criminally responsible in any way or specifically guilty of bribery. Thus, the government has not proved by a preponderance of the evidence that the developers were criminally responsible participants, and the district court's conclusion that they were participants was clearly erroneous. On remand, the district court shall subtract the two offense levels added under U.S.S.G.

§ 3B1.1(c) from Badaracco's total offense score.

### B.

### *Amount of Loss*

■ Under the Sentencing Guidelines, the base offense level for fraud is six, U.S.S.G. § 2F1.1(a) (1990), which must be increased according to the size of the loss attributed to the fraud. U.S.S.G. § 2F1.1(b). The district court set the loss attributable to Badaracco's fraud at $293,-000, and accordingly added eight levels to the base offense level of six. *See* U.S.S.G. § 2F1.1(b)(1)(I). Badaracco argues that the court erred in using the $293,000 figure. Because Badaracco is challenging the district court's interpretation of the "loss" concept in section 2F1.1(b), our review is plenary. *See Bierley*, 922 F.2d at 1064.

The district court calculated the "loss" caused by Badaracco's fraud by adding together the amounts of the three electrical contracts awarded to the Badaracco family companies by the three developers: the Crystal Condos contract ($78,300);[6] the Adams Street Contract ($175,000); and the Fourteenth Street contract ($40,000). Thus, the $293,000 was based on Badaracco's gain rather than on Elysian's loss. The district court apparently relied on the guideline commentary which states: "[t]he offender's gross gain from committing the fraud is an alternative estimate that ordinarily will understate the loss." U.S.S.G. § 2F1.1 Commentary, Application Note 8 (1990).

Badaracco did not challenge the use of a gain measure to calculate loss. Instead,

citing *United States v. Schneider*, 930 F.2d 555 (7th Cir.1991),[7] he argued that the loss attributed to his actions should be based on the "value of the benefit received,"[8] *i.e.*, the net profit earned by the companies on the three contracts. Under Badaracco's net gain theory, the loss attributable to his fraud would be some fraction ($10,320, according to Badaracco) of $293,000. Accordingly, the proper increase under section 2F1.1(b) would be three, rather than eight, levels. The district court declined to follow *Schneider* and rejected the net profit calculation as a "false standard." App. at 68.

After we heard argument in this case, another panel of this court decided *United States v. Kopp*, 951 F.2d 521 (3d Cir.1991), which also analyzes the loss calculation under U.S.S.G. § 2F1.1(b) (1990). In *Kopp*, defendant, a real estate developer, pleaded guilty to procuring a $13.75 million bank loan by fraudulent misrepresentation in violation of 18 U.S.C. § 1344 (1988) (subsequently amended). The bank calculated its actual loss to be $3.4 million. The district court, however, decided that for purposes of section 2F1.1(b) the amount of loss was the full $13.75 million face value of the loan regardless of the actual loss sustained by the bank.

This court recognized that there was a division in relevant case authority regarding the proper loss calculation under section 2F1.1(b), decided that the logic of *Schneider*, 930 F.2d at 555, and *United States v. Hughes*, 775 F.Supp. 348 (E.D.Cal. July 10, 1991), was "compelling," and thus adopted the general principle "that fraud 'loss' is, in the first instance, the amount of

---

**6.** The initial electrical contract awarded to Badaracco Brothers by the Crystal Condos project was valued at $78,300. The replacement contract, which was awarded to Bad–Mar Electric, was worth $16,000. Because the second was a replacement contract, Badaracco and the government agree that its value should not be included in the computation of Badaracco's gross gain. App. at 32.

**7.** In *Schneider*, where the court distinguished between fraud and theft, the court suggested that when a fraud is committed "in order to obtain a contract that the defendant might otherwise not obtain, but he means to perform the

contract," the appropriate loss calculation under section 2F1.1(b) is the defendant's net profit, *i.e.*, the contract price minus costs. 930 F.2d at 558. Badaracco argued that he (like the defendants in *Schneider*) was guilty of this type of fraud only, as distinguished from the fraud perpetrated by a "con artist" who "means to pocket the entire contract price without rendering any service in return." *Id.*

**8.** Badaracco lifts the phrase "value of the benefit received" from U.S.S.G. § 2C1.1 (1990). Section 2C1.1 deals with the bribery of public officials or extortion under color of official right and is inapplicable to this case.

money the victim has actually lost (estimated at the time of sentencing)." *Kopp,* 951 F.2d at 536. This figure should be revised upward to the "intended or probable loss if either amount [is] higher and determinable." *Kopp,* 951 F.2d at 523.

We invited the parties to comment by letter memoranda on the applicability of *Kopp* to the issue of loss in this case. Not surprisingly, Badaracco argues that there should be no upward adjustment based on loss. He states first, that the losses to the bank, if any, were the result of a faltering real estate market;[9] and second, that the alternative calculation based on intent is inapplicable because his intent was not to inflict any loss on the bank but only "for the electrical companies in which he or his family had an interest to obtain the contracts, render the services and make a profit on the contracts." Letter from Appellant dated Dec. 18, 1991. In contrast, the government suggests that actual loss could lead to a much higher figure than the district court used because a number of the loans to the developers totalling over several million dollars are in foreclosure. It is, nonetheless, satisfied with the "compromise position" taken by the district court. Letter from Appellee dated Dec. 19, 1991.

There is some basis in the record from which a court might find that whatever Elysian's "actual loss" may have been, its "probable loss" exceeded $293,000. The Presentence Report is incomplete as to the total dollar amount of the loans made to the developers, but does set forth that at least $5 million was involved. The facts on record could support a finding that Badaracco's actions made probable the loss of a significant amount of the money Elysian lent to the developers. First, the three Badaracco related companies with which the developers were forced to contract had a reputation for poor quality work. *See, e.g.,* Presentence Report ¶ 15. The district court found that some of the electrical work performed on the contracts in issue was performed in "an exceptionally shoddy manner." App. at 68. Badaracco Brothers

failed to complete the work on Crystal Condos, and Tuohy was forced to obtain a replacement contract from Bad–Mar at a grossly inflated price. One could reasonably conclude that Badaracco's insistence that the developers use these companies contributed to the ultimate failure of the projects.

Second, Badaracco's interference with the progress of these projects and his and Gorga's apparent diversion of funds from these to other projects further jeopardized their completion and success. Third, the Badaracco companies were not the lowest bidder with respect to the contracts they obtained, but were awarded the contracts despite their grossly inflated bids. As a result, the loans the developers needed from Elysian were higher than they would have been otherwise and default by the developers was more likely. Finally, these loans were not fully paid and are in the process of foreclosure. Three of the developers involved in Badaracco's scheme have filed suit against Elysian to prevent foreclosure of their loans, thus exposing Elysian to legal fees. Presentence Report ¶ 106.

Were we required by *Kopp* to apply its holding to use actual loss or, as an alternative, intended or probable loss, we would be obliged to remand because the district court did not make the necessary findings of actual or probable loss. However, that is not required in this situation.

*Kopp* has markedly clarified the law on loss in this circuit, but it is readily distinguishable from this case. Although section 2F1.1 is applicable to a wide variety of fraud schemes, the sentencing judge is entitled, probably compelled, to evaluate the size of the loss based on the particular offense. *Kopp* involved the ordinary two party arrangement in which the borrower fraudulently obtained a loan from a bank in violation of 18 U.S.C. § 1344. In such a case, at least where the victim's "true 'loss'" is measurable, *Kopp* held that there is no justification for using the defendant's

---

9. We held in *Kopp* that the guideline loss should not be reduced simply because the victim bank

or a third party may have augmented it. *See Kopp,* 951 F.2d at 523.

gross gain as an alternative measure of loss. *Kopp*, 951 F.2d at 531.[10]

This case presents in effect a three party situation because the loans were made by the bank to independent developers on the condition imposed by Badaracco that his family companies benefit. Badaracco, as an officer of a federal credit institution, was convicted under 18 U.S.C. § 1006, which provides in pertinent part that:

> Whoever, being an officer ... [of] any lending, mortgage, insurance, credit or savings and loan corporation or association authorized or acting under the laws of the United States ... with intent to defraud any such institution ... *participates or shares in or receives directly or indirectly any money,* profit, property, *or benefits through any transaction,* loan commission, contract, or any other act of any such corporation, institution, or association, shall be fined not more that $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1006 (1988) (subsequently amended) (emphasis added). Thus, the gravamen of section 1006, unlike section 1344 as applied to Kopp, is the benefit received by Badaracco from the developers.

In *Kopp*, the court declined to accept an automatic equation between theft and fraud cases, because the theft guideline defines "loss" as the "amount taken." We recognized that embezzlement crimes might share some of the attributes of fraud in that there may be an intent to return the money, but we explained placement of embezzlement under the theft guideline because "embezzlement, unlike ordinary theft or fraud, involves not only a taking but also an action akin to a breach of fiduciary duty, which might justify always using the amount taken as 'loss.'" *Id.* 951 F.2d at 530 n. 13.

We conclude that this is a case in which analogy to embezzlement is appropriate under the fraud guideline. *See* U.S.S.G.

§ 2F1.1 Commentary, Application Note 7 (referring to discussion of valuation of loss in U.S.S.G. § 2B1.1). When the officer of a financial institution uses his or her position for personal benefit, there is a breach of fiduciary duty comparable to that implicated by embezzlement, which may justify using the "gross gain" alternative to estimate "loss," expressly authorized in Application Note 8.[11]

The dissent agrees that in this case we must look to the gain received by the Badaracco related companies rather than the bank's loss, as we did in *Kopp*. The dissent, however, would have the sentencing court embark on the tangled inquiry of net gain, analogizing to the actual loss analysis applied in *Schneider*. We believe the analysis inapt for several reasons.

The applicable guideline instructions explicitly referred to "gross gain." More important, in *Schneider* the court could equate the probable loss to the victim as an approximation of the benefit to the defendants had the fraudulent transaction not been aborted. Here, because the bank did not deal with the Badaracco related companies and it never could have received the kind of benefit from the transaction which was the basis of the *Schneider* court's analysis, it was appropriate to measure the gain received by the Badaracco related companies without any deduction.

We conclude that the district court's use of the $293,000 value of the electrical contracts as the gross gain to measure loss was both reasonable and in keeping with the applicable provisions of the Sentencing Guidelines. Accordingly, we affirm that portion of the district court's judgment increasing Badaracco's base offense level by eight under section 2F1.1(b)(1)(I).

## C.

### *Violation of the Plea Agreement*

█ The district court increased Badaracco's base offense level by two on the

---

10. In this case, actual loss to the bank was not measurable at the time of sentencing. Although *Kopp* rejected use of an alternative estimate when the true loss is measurable, that is not the situation here.

11. As noted in *Kopp*, this Application Note was amended in 1991 to replace "offender's gross gain" with "offender's gain." *See Kopp*, 951 F.2d at 530 n. 15. Because we do not remand

basis of a probation department finding that Badaracco's offense involved "more than minimal planning." U.S.S.G. § 2F1.1(b)(2). Badaracco argues that this two-level upward adjustment should be reversed because the government violated that portion of the plea agreement stipulating that "the defendant's conduct did not involve more than minimal planning," App. at 26. He points to the following oral statement made by the attorney for the government at Badaracco's sentencing hearing:

> ... [W]e did stipulate when we entered into the plea agreement that it appeared there was nothing more than opportune, when the contractors came in, he took advantage of the situation. There didn't seem to be a drawing in of the developers and that's why I concluded that it did not appear to be more than minimal planning.

> The only exception to this is the fact that, and I've raised it later on in my brief to the Court, that Mr. Badaracco never admitted to the bank that he had any ties to these companies. In fact, just the opposite.

> If the Court can go off anywhere, it is there [sic] that *there was an affirmative step taken by Mr. Badaracco indicating that he was concealing something,* but it just appears to me from the investigation of this case that nothing more than contractors coming in and him taking advantage of the opportunity is what presented itself here.

App. at 61–62 (emphasis added).[12]

"Whether the government's conduct violates the terms of the plea agreement is a question of law and our review is plenary." *United States v. Moscahlaidis,* 868 F.2d 1357, 1360 (3d Cir.1989). The principles governing the government's obligation to honor the terms of a plea agreement are well-settled.

> The Supreme Court, in *Santobello [v. New York],* 404 U.S. 257 [92 S.Ct. 495, 30 L.Ed.2d 427] [ (1971) ], held that when a

prosecutor makes a promise in a plea agreement, he must keep that promise. The Court stated that there must be "fairness in securing agreement between an accused and a prosecutor." *Santobello,* 404 U.S. at 261 [92 S.Ct. at 498]. In this circuit, "the government must adhere strictly to the terms of the bargain[s] it strikes with defendants." *United States v. Miller,* 565 F.2d 1273, 1274 (3d Cir.1977)[,*cert. denied,* 436 U.S. 959, 98 S.Ct. 3076, 57 L.Ed.2d 1125 (1978) ]....

> Although a plea agreement occurs in a criminal context, it remains contractual in nature and is to be analyzed under contract-law standards.... Courts should consider not only contract principles but also ensure that the plea bargaining process is "attended by safeguards to insure the defendant [receives] what is reasonably due in the circumstances." *Santobello,* 404 U.S. at 262 [92 S.Ct. at 499]. ... Thus, the government cannot resort to a rigidly literal approach in the construction of language. *United States v. Crusco,* 536 F.2d 21 (3d Cir.1976)....

*Id.* at 1361 (citations and footnote omitted). "In determining whether the terms of a plea agreement have been violated, [the] court must determine whether the government's conduct is inconsistent with what was reasonably understood by the defendant when entering the plea of guilty." *United States v. Nelson,* 837 F.2d 1519, 1521–22 (11th Cir.), *cert. denied,* 488 U.S. 829, 109 S.Ct. 82, 102 L.Ed.2d 58 (1988). "However, cases of disappointed but unfounded expectations must be carefully distinguished from those in which the defendant's expectations as to his sentence are predicated upon promises by the Government or statements from the court." *Crusco,* 536 F.2d at 24.

In *Moscahlaidis,* the defendant was convicted of crimes arising out of a conspiracy to import contaminated cheese into the United States. The government agreed not

---

on this issue, we need not consider the effect of this change in subsequent sentencings.

**12.** Badaracco does not challenge any statements contained in the government's written sentencing memorandum.

to "take a position relative to whether or not a custodial sentence shall be imposed on John Moscahlaidis." 868 F.2d at 1358. In the sentencing memorandum submitted to the court, the government referred to "Moscahlaidis' greed and moral bankruptcy," and opined that "Moscahlaidis cannot maintain even the air of irreproachable virtue with any degree of legitimacy," that he "is not just a white-collar criminal," and that "[t]his demonic pursuit demonstrates Moscahlaidis' utter contempt for the welfare of his fellow man." *Id.* at 1359. This court concluded that the government's statements were " 'a transparent effort to influence the severity' of Moscahlaidis' sentence," and thus constituted a breach of the plea agreement. *Id.* at 1362 (quoting *Crusco*, 536 F.2d at 26); *see also Crusco*, 536 F.2d at 26 (government's characterization of defendant as "a major figure in organized crime who would endanger the community if he were on the streets" violated government's promise to take no position on sentencing).

Under the Sentencing Guidelines, "more than minimal planning" exists where "significant affirmative steps were taken to conceal the offense." U.S.S.G. § 1B1.1 Commentary, Application Note 1(f). The comment by the attorney for the government that "there was an affirmative step taken by Mr. Badaracco indicating that he was concealing something" provided the district court with a basis to reject the government's stipulation in its plea agreement and to adopt the probation department's recommendation that there was more than minimal planning by Badaracco. We therefore agree with Badaracco that the government violated the spirit, if not the letter, of the plea agreement.[13]

The government contends that "[t]he instant agreement simply obligated [it] to recommend that no adjustment be made for more than minimal planning" and that it honored that agreement, Appellee's Brief at 26; that it did not characterize Badaracco's concealment of his scheme from Elysian as a *"significant* affirmative step"

and therefore did not suggest to the district court that Badaracco had engaged in more than minimal planning, *see* U.S.S.G. § 1B1.1 Commentary, Application Note 1(f) ("more than minimal planning" exists when *"significant* affirmative steps [are] taken to conceal the offense" (emphasis added)); that the challenged statement was permissible because the government had expressly reserved its right to inform the sentencing judge of the "nature and extent" of Badaracco's activities and relevant conduct with respect to this case; and that it "could not ignore direct evidence demonstrating that its stipulation was not appropriate. Thus, the prosecutor properly addressed this issue head-on by recognizing it and then attempting to diminishing [sic] its significance." Appellee's Brief at 27.

None of the government's arguments are persuasive. We observe first that the government mischaracterizes its obligation under the plea agreement, which plainly provides that the parties agreed to stipulate that Badaracco's "conduct did not involve more than minimal planning." This language does not support the government's more restrictive reading that it had agreed simply not to recommend an upward adjustment. We also reject the government's argument that its characterization of Badaracco's concealment as an "affirmative step" rather than a "significant affirmative step" is of any moment. The absence of this one word from the government's argument to the district court is inconsequential. The government's meaning and intention with regard to the "minimal planning" enhancement were clear.

Nor are we convinced that the government's statement concerning Badaracco's concealment was a permissible reference to the nature and extent of his activities and relevant conduct with respect to this case. In light of the fact that Badaracco's concealment from Elysian of his interest in the three electrical companies was

13. Because we reverse the two-level enhancement under U.S.S.G. § 2F1.1(b)(2) on the basis of the government's violation of the plea agreement, we need not consider the propriety of the adjustment as a substantive matter.

the basis of Badaracco's conviction for bank fraud, "the court had all the information before it and was capable of forming its own impressions without the assistance of the Government." *Crusco*, 536 F.2d at 26.

More important, an examination of the government's oral statement as a whole makes plain that the reference to Badaracco's concealment was not made in the course of describing the nature and extent of his activities, but instead was made in the course of a discussion about the "more than minimal planning" stipulation. It is clear from a simple reading of the government's statement to the district court that the remarks about concealment were meant to serve as a possible basis for the district court to ignore the stipulation in the plea agreement.

 For this reason, the government's final argument, that it was "attempting to diminish[ ] the significance" of Badaracco's concealment, must also fail. However, there are more serious problems with this final argument. The government contends that it "could not ignore direct evidence demonstrating that its stipulation was not appropriate." The government errs. The government freely entered into the plea agreement with Badaracco and expressly agreed to the challenged stipulation. Badaracco relied on the government's promise to adhere to this stipulation in deciding to enter a plea of guilty and thus to forego his constitutional right to a trial by jury. The government was aware of Badaracco's concealment of his interests from Elysian when it entered into the plea agreement. Although the plea agreement authorized deviation based on after-acquired evidence, this was not such a situation. As is the case with any contract, the government is not free to breach its agreement with a defendant because it decides after the fact that it has made a bad bargain.

The government need not endorse the terms of its plea agreements "enthusiastically." *United States v. Benchimol*, 471 U.S. 453, 455, 105 S.Ct. 2103, 2105, 85 L.Ed.2d 462 (1985). However, if the stipulation bargained for by Badaracco—and for which he "surrender[ed] ... certain constitutional rights including a meaningful restriction of his liberty"—is to mean anything, it must preclude remarks like the government made here. *See United States v. Hayes*, 946 F.2d 230, 233 (3d Cir.1991). We cannot countenance such a blithe repudiation of the terms of a negotiated plea. "*Santobello* and its progeny proscribe not only explicit repudiation of the government's assurances, but must in the interests of fairness be read to forbid end-runs around them." *United States v. Voccola*, 600 F.Supp. 1534, 1537 (D.R.I.1985).

 In this circuit, when the government fails to adhere to a plea agreement, "the rule is to remand the case to the district court for it to determine whether to grant specific performance or allow withdrawal of the plea." *Moscahlaidis*, 868 F.2d at 1363. Because Badaracco has already served a considerable portion of a custodial sentence, permitting the withdrawal of his plea would be an empty remedy. It follows that specific performance is the only adequate remedy, *i.e.*, resentencing under conditions in which the government adheres to its plea agreement. In *Moscahlaidis*, we stated that under such circumstances, the case should be transferred to another judge for resentencing. *Id.*

We will therefore remand to the district court so that it can transfer this matter to another judge who will determine whether Badaracco's offense involved more than minimal planning within the meaning of U.S.S.G. § 2F1.1(b)(2) and will resentence Badaracco in accordance with that determination.

### D.

#### *Restitution*

Badaracco appeals the district court's order that he pay $293,000 in restitution to Elysian, arguing that restitution was improper because Elysian did not suffer any loss from Badaracco's crimes. The Probation Officer who prepared the Presentence Report did not recommend restitution and stated that the "U.S. Attorney's office

could not determine the amount of loss to the victim's bank." Presentence Report ¶ 45. Although the government stated in the plea agreement that the sentencing judge may order Badaracco to pay restitution pursuant to 18 U.S.C. §§ 3663 and 3664, during Badaracco's sentencing hearing the government offered no evidence or argument for a sentence of restitution. Restitution to Elysian was not mentioned until the district court passed sentence on Badaracco from the bench.[14]

Generally, "[o]ur review of whether the district court incorrectly imposed an order of restitution is bifurcated: we exercise plenary review over whether the award is permitted under law but we review the particular award for abuse of discretion." *United States v. Furst*, 918 F.2d 400, 408 (3d Cir.1990).

Orders of restitution are authorized by the Victim and Witness Protection Act of 1982 (VWPA), 18 U.S.C. § 3663(a) (1988); *see also* U.S.S.G. § 5E1.1 (1990). "Difficulties of measurement do not preclude the court from ordering a defendant to compensate the victim through some restitution." *United States v. Hand*, 863 F.2d 1100, 1104 (3d Cir.1988). In this circuit, we require the district courts " 'to make specific findings as to the factual issues that are relevant to the application of the restitution provisions of the VWPA.' " *Furst*, 918 F.2d at 410 (quoting *United States v. Palma*, 760 F.2d 475, 480 (3d Cir.1985)).

The United States Supreme Court has recently held that the VWPA "authorize[s] an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413, 110 S.Ct. 1979, 1981, 109 L.Ed.2d 408

(1990). Thus, where, as here, a defendant is charged in a multi-count indictment, any award of restitution must be based on losses to the victim that were caused by the counts of which the defendant was convicted or to which he pled guilty.[15]

The above principles inform our review of the district court's order that Badaracco make restitution to Elysian in the amount of $293,000—the cumulative value of the electrical contracts improperly directed to the Badaracco family businesses.

As an initial matter, we note that the district court did not, as required by *Furst* and *Palma*, "explain[ ] how the amount of ... restitution imposed was related to any loss caused by the conduct underlying the ... offenses" to which Badaracco pleaded guilty. *Furst*, 918 F.2d at 410. This alone would require a remand to require the district court to set forth specific findings showing the causal connection between any amount of restitution imposed and the crimes to which Badaracco pleaded guilty.

However, the district court's order also suffers from a more fundamental defect because it does not, as required by *Hughey*, derive the amount of restitution from the losses actually suffered by Elysian as a result of the four incidents of bank fraud to which Badaracco pleaded guilty. Instead, the district court added together the value of each of the four electrical contracts given to the three family companies by the developers. Although we have held *supra* that gross gain is a valid measure of the loss attributable to this offense for purposes of guideline sentencing, a restitution order, in contrast, must be limited to the amount of Elysian's loss as a result of

---

**14.** The government argues that Badaracco waived his objection to the restitution order by not raising it at the district court level and that therefore we may not grant Badaracco relief unless we find that the district court committed "plain error." Because we find that the district court did commit a plain error of law, we need not decide whether Badaracco waived the issue for purposes of appeal.

**15.** We reject Badaracco's argument that because "[i]t is not an element of [bank fraud] that the

defendant caused a loss to the banking institution," appellant's brief at 22, there can be no restitution to the victim. Badaracco offers no support for his argument that restitution is not appropriate if the "gravamen" of a particular offense is the defendant's gain rather than the victim's loss. It is plain to us that restitution can be awarded whenever the offense of conviction causes a loss to the victim as a matter of fact irrespective of the theoretical "gravamen" of the offense of conviction.

Badaracco's bank fraud.[16] Therefore, on remand, the district court must recalculate the restitution award based on Elysian's losses from the loans it made to the contractors as a result of Badaracco's fraud.

The statute provides that "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(d) (1988).[17]

We note that the Presentence Report states that some or all of the loans at issue in this case are in the process of foreclosure. Three developers have filed suit against Badaracco, Elysian, and its board of directors to prevent foreclosure of their construction loans. Presentence Report ¶ 106. The statute precludes restitution for losses "for which the victim has received or is to receive compensation." *See* 18 U.S.C. § 3663(e)(1) (1988); *Palma,* 760 F.2d at 480.

In sum, we vacate the order of restitution and remand to the district court to recalculate the amount of restitution to be awarded and to provide a statement of the specific facts justifying any such order. In that connection, we call to the court's attention our prior direction that any doubts are to be resolved against the defendant and " 'with a view toward achieving fairness to the victim.' " *Hand,* 863 F.2d at 1104 (quoting S.Rep. No. 532, 97th Cong., 2d Sess. 31 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2515, 2537).

### E.

#### Downward Departure

Finally, we address briefly Badaracco's claim that the district court threatened to retaliate against him at resentencing for taking an appeal to this court. The statement to which Badaracco alludes was made in the context of Badaracco's request for bail, and referred to the court's grant of a six-month downward departure pursuant to U.S.S.G. § 5K1.1 for cooperating with the government. It is plainly premature for us to consider action that the district court has not yet taken. It appears to us that Badaracco is asking us to issue an advisory opinion, "a practice greatly disfavored by us." *Callwood v. Questel,* 883 F.2d 272, 275 (3d Cir.1989) (per curiam); *accord United States v. Berkery,* 889 F.2d 1281, 1283 n. 2 (3d Cir.1989). We are confident that the district court would not intentionally take any action that would violate the holding of *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), upon which Badaracco relies. By so stating we do not suggest that denial of the downward departure upon remand would necessarily implicate *Pearce.* We simply do not reach Badaracco's vindictiveness claim.

### III.

#### Conclusion

As set forth above, we hold that the district court erred in concluding that U.S.S.G. § 3B1.1(c) provides a basis for a two level upward adjustment based on Badaracco's role in the offense. We affirm the district court's judgment increasing Badaracco's base offense level by eight under U.S.S.G. § 2F1.1(b). Because we hold that the government breached its plea agreement with Badaracco, we will remand so that a different district judge can resentence Badaracco after making the determination whether Badaracco's offense "involved more than minimal planning" pursuant to U.S.S.G. § 2F1.1(b)(2). Depending on the court's resolution of the minimal

---

16. We need not decide whether the value of the contracts would have been an appropriate basis for a restitution order to some victim, presumably the contractors, if Badaracco had pleaded guilty to receiving gifts from the contractors for procuring the loans in violation of 18 U.S.C. § 215 since those counts were dismissed as part of the negotiated plea and a restitution order based thereon would plainly violate *Hughey.*

17. In order to determine the appropriateness and amount of a restitution award, "[t]he sentencing judge may base findings on the presentence report or other testimony or evidence." U.S.S.G. § 5E1.1, Commentary, Background ¶ 4 (1990).

planning issue, Badaracco's total offense level will be either fourteen or sixteen. Because his Criminal History Category is I, the guideline sentencing range will be either between 15 and 21 months or between 21 and 27 months, subject to the possibility of a six-month downward departure for cooperation with the government.[18] Finally, we will vacate the district court's order of restitution and remand to the district court for recalculation of restitution in line with this opinion. The mandate shall issue forthwith.

WEIS, Circuit Judge, concurring and dissenting.

I join in the majority opinion except with respect to Part II. B.

In determining the amount of "loss" for purposes of Sentencing Guideline computations, the majority and I are in agreement that in the circumstances presented here the offender's "gross gain" is an appropriate standard for increasing the base offense level. In the district court the parties concurred on the use of gain and that should govern the disposition of this appeal. I, however, would employ a different method than the district court and the majority in arriving at the defendant's gain.

The gross value of the contracts at issue was $293,000. No evidence exists whatsoever that defendant did not intend to have the Badaracco companies perform the contracts and indeed he asserted that they were "at most 80% completed." There also can be no dispute that performance of the contracts required that the Badaracco companies expend money for labor and materials. In business practices, such expenditures must be deducted to arrive at the gain to the contractors—they are costs of performance.

If all had gone well, the Badaracco companies would have made a profit measured by the difference between the contract price and the expense incurred—that sum

would be the defendant's "gain." (Actually, defendant's personal benefit would have been less, but he does not challenge being treated as if he and the family companies were one entity for purposes here.)

The gain, therefore, should be measured initially by the profit on the projects. To this amount should be added such "gains" as the amount of overhead included in the costs of the project that would otherwise have been borne by the Badaracco companies, an estimate of the benefit attributable to providing work for their employees, and the value of keeping otherwise idle tools or equipment in operation. Combining these estimates would lead to a realistic appraisal of the "gross gain" to the defendant.

Merely relying on the contract price as defendant's gain distorts the severity of the defendant's offense. The situation, in fact, would have been quite different if defendant received $293,000 for electrical contracts he never intended to perform. In that event, defendant would clearly gain the entire $293,000 and the guidelines would have required an addition of eight points to the base offense level. However, that is the same increase the district court used here. Thus, no distinction would exist between that aggravated situation of clear fraud and the one here where the actual, realistic benefit to the defendant was substantially less. A sentence such as the one imposed ignores reality and is contrary to the intent of the guidelines that an increased benefit to the defendant should lead to an increased sentence.

An analogous situation was described in *United States v. Schneider,* 930 F.2d 555 (7th Cir.1991), where the issue was the loss to the victim caused by fraudulent procurement of a contract. The Court rejected the government's contention that the loss was the full amount of the contract in circumstances where the defendant had intended to perform the construction. The Court found the proposition "irrational" in that it would result in the same penalty as one

---

**18.** In the event that the district court does not have the opportunity to resentence Badaracco before he serves 9 months of his sentence, *i.e.,* the minimum of the Guidelines range less the 6 months downward departure for cooperation, we assume the court will grant bail so that Badaracco is not obliged to remain in detention beyond the minimum sentence he might ultimately have to serve.

assessed against a "con artist" who had intended to take the full amount set out in the contract, but never perform it. *Id.* at 558.

Although *Schneider* discussed loss to the victim and the issue here is benefit to the wrongdoer, the two situations are but different sides of the same coin. I would adopt the rationale of *Schneider* which we recently approved in *United States v. Kopp,* 951 F.2d 521 (3d Cir.1991); *see also United States v. Smith,* 951 F.2d 1164, 1167 (10th Cir.1991) ("[I]t is a net value that must be used to measure loss. Any other approach ignores reality.").

As the majority observes, the bank did not receive a benefit and that fact makes it appropriate to look to the defendant's gain. It does not follow, however, that the face amount of the contracts should be used to enhance the sentence. The "gain" the majority uses is purely fictional, but the increased period of incarceration is starkly real.

I would remand to the district court for a determination on the gain defendant received and a reevaluation of the sentence.

On this record recalculation could not include any potential loss to the bank in foreclosures because there has been no showing that the electrical work in any of the projects led to default on mortgages. I find no basis on which it may reasonably be concluded that the developers' use of the defendant's companies caused the failure of any project. The presentence report notes that the government conceded, "it is fair to state that any losses to the Bank on these loans will be more the result of a faltering real estate market than as a result of the defendant's fraud."

I agree with the majority that the matter of restitution must be reconsidered by the district court. This is in the nature of a civil remedy to make the victim whole for the loss actually incurred or expected to be incurred as a result of the wrongful conduct. Consequently, there must be a nexus established between the criminal act and the loss. The victim is entitled to reimbursement, but not a windfall. To compensate the bank here for losses caused by the deteriorated real estate market on the fortuity that the defendant's illegal acts occurred at approximately the same time could not be justified as restitution. *See, e.g., United States v. Tyler,* 767 F.2d 1350, 1351 (9th Cir.1985) ("[R]estitution is proper only for losses *directly* resulting from the defendant's offense.") (emphasis in original).

The government acknowledged that the bank was aware that the Badaracco companies were the beneficiaries of work related to the construction loans. The defendant's crime was that he had assured the bank that he did not have an interest in any of these companies. Nothing in the record indicates that the loans would not have been approved had the defendant disclosed his ties to the family business. *See generally Hughey v. United States,* 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990).

I join in the order for remand, but would include a reassessment of "gain" as a factor in determining the sentence.